246 P.3d 1260 (2011)
STATE of Washington, Petitioner,
v.
Kristina Ranae GRIER, Respondent.
No. 83452-1.
Supreme Court of Washington, En Banc.
Argued September 21, 2010.
Decided February 10, 2011.
*1262 Thomas Charles Roberts, Pierce County Prosecutor's Office, Tacoma, WA, for Petitioner/Appellant.
Casey Grannis, Nielsen Broman & Koch, P.L.L.C., Seattle, WA, for Appellee/Respondent.
Seth Aaron Fine, Snohomish County Prosecutor's Office, Everett, WA, Pamela Beth Loginsky, WAPA, Olympia, WA, amicus counsel for Washington Association of Prosecuting Attorneys.
MADSEN, C.J.
¶ 1 Kristina Grier appealed her conviction of second degree murder, and the Court of Appeals reversed because it held that Grier received ineffective assistance of counsel. This case requires us to determine whether Ms. Grier's defense counsel was ineffective in withdrawing a request for jury instructions on the lesser included offenses of first and second degree manslaughter after consulting with his client. We hold that Grier's acquiescence in the decision to withdraw the lesser included offense instructions does not bar her from raising an ineffective assistance claim. However, we also hold that her defense counsel's "all or nothing" approach was a legitimate trial tactic and did not constitute ineffective assistance of counsel under the state or federal constitutions. Accordingly, we reverse the Court of Appeals and remand for disposition of Grier's outstanding claims.

FACTS AND PROCEDURAL HISTORY
¶ 2 On the evening of February 21, 2006, defendant Kristina Grier had several visitors in her home, including Gregory Owen; Michelle Starr, Owen's fiancée; Owen and Starr's five-year old daughter; Nathan Grier, Grier's 17-year-old son (hereinafter "Nathan" for clarity purposes); and Cynthia Michaels, Nathan's girl friend. Grier and her son had known Owen for more than a year.
¶ 3 Nathan testified that Grier owned two nine-millimeter gunsone black and one silver and blackas well as a shotgun and a rifle.
¶ 4 At one point in the evening, Owen and Michaels left Grier's home for a brief errand. While Owen and Michaels were gone, Grier took some liquor and retreated to her bedroom. Upon his return, Owen went to join her. According to Nathan, who later joined Grier and Owen in the bedroom, Grier showed both of her nine-millimeter guns to Owen, who asked her to put them away because he was not allowed to be in contact with guns, having recently left prison. Grier placed the guns in her purse, Nathan recalled.
*1263 ¶ 5 With Owen present, Starr inquired as to how many guns Grier owned, and Nathan told her. Starr suggested taking the guns away for the evening, given Grier's intoxication. When Grier looked away, Nathan testified, Owen took Grier's purse, which contained two of her guns, and he began taking items out of it and putting them into his pocket. By that time, Nathan recalled, his mother was "really drunk," so he carried her into her room and put her to bed. 2 Verbatim Report of Proceedings (VRP) (Apr. 11, 2007) at 147.
¶ 6 While Grier was in her bedroom, Owen began unloading the clips from the guns that had been in Grier's purse. He told Nathan he liked Grier's gun and could not purchase guns because of his criminal record. Nathan testified that he tried to stop Owen from taking his mother's silver and black gun, but Owen used brute force to prevail. "[H]e shove[d] my head up against the wall and stuck that little gun in my mouth, you know, pretty hard, and it, like, ripped the top of my mouth. And he was saying, Whose gun is it; whose gun is it?" Id. at 150.
¶ 7 Nathan testified that he told Owen to leave, knowing his mother would be upset when she awoke and discovered her gun was missing. Owen and Starr began taking their belongings out to their car, and Nathan accompanied them. Nathan testified that as they were walking down the driveway, he saw Owen fire a gun toward the neighbors' house. According to Nathan, Owen kept the gun "under his sweater" while placing his other belongings in the car. Id. at 152-53.
¶ 8 The gunshot aroused Grier, who called out from her bedroom, "Do you [expletive] have my gun? He stole my gun." Id. at 153. Owen went back into Grier's bedroom and attempted to calm her down, insisting that he had not stolen her gun. According to Nathan, Grier seemed to believe Owen "[f]or a couple of seconds until she checked." Id. at 154.
¶ 9 Later in the evening, Nathan and Owen got into a heated argument. Owen punched Nathan in the face, splitting his lip and causing enough damage to necessitate stitches later that evening. Nathan testified that he "was gushing blood everywhere." Id. at 188. Starr testified that Owen "smacked" her after punching Nathan. Id. at 241-42.
¶ 10 At that time, Nathan recalled, Grier emerged from her bedroom and announced that her gun was no longer in her purse. Grier saw what Owen had done to Nathan, and she told Owen to leave her son alone. A scuffle then ensued between Grier and Owen. Nathan was not sure if Owen had slapped Grier, but he testified that he "kept putting his hand on her and pushing her real hard." Id. at 158. According to Nathan, Grier did not have her guns on hand at that time.
¶ 11 Later, Nathan testified Grier continued to express concern about her missing guns. Grier fetched her shotgun from the closet and checked to confirm that it was loaded. She went outside, where Michaels, Starr, and Owen were loading belongings into Owen's car.
¶ 12 Frightened, Nathan locked himself in a room and quietly called 911, reporting that everyone had guns. He heard yelling outside, hung up, and ran outside to investigate. Another scuffle had ensued. According to Starr, Grier cocked her gun and pointed it toward Owen and herself, but mostly toward Owen. According to Nathan, "[t]hey beat [Grier] up and pushed her head to the ground, you know, and took the shotgun." Id. at 162. Starr explained that she had "slammed" Grier's head on the concrete ground because Grier had grabbed her hair and refused to let go. Id. at 246. Afterward, Nathan testified, his mother approached him, in tears, and asked him to do something, saying "[t]hey have got our guns now." Id. at 162. Starr testified that Owen put Grier's shotgun in his car.
¶ 13 After Nathan attempted to console her, Grier went back inside the house. Nathan went inside as well, where Michaels informed him that his face was "bleeding everywhere." Id. at 163. He told his mother that earlier in the evening, Owen had placed a gun in his mouth and pushed him up against a wall.
¶ 14 Owen joined the others inside. According to Nathan, "[Owen] thinks I told my mom that he had the gun, and he starts calling me a snitch and a bitch." Id. at 196. *1264 Grier "came back around the corner and said, Get away from my son; get out of my house," and when Owen began yelling back, Grier responded, "You are not going to beat my son. You are not going to push me around or beat me." Id. at 165. Nathan testified that if Grier had a gun at that time, he did not see it. Id. Next, Nathan recalled:
He put his hands on her, pushed her again. And then she kind of grabbed on to him so she wouldn't fall, like pulling on him, and I think, checking his pockets, you know, trying to get her gun back. And he kept pushing her, you know, and then she tried to push him back and then he tried to push her away. And he was yelling at her a bunch of shit, likeI don't know. He was yelling.
Id. Then Nathan heard a bang. He did not see either party fire a shot. Nathan testified that he was "pretty sure"but not certain that Owen had been armed at the time of the shooting. Id. at 171.[1]
¶ 15 According to Nathan, it appeared as though Owen was "going back" and Grier was "trying to grab, you know, like his hands so he wouldn't do nothing, kind of like just grab on him, stop him if [sic] was going to start shooting up everybody or something." Id. at 166. In particular, Nathan testified, Grier appeared to be grabbing Owen to prevent him from reaching into his pocket and pulling out a gun. That was the last of the exchange that Nathan saw. Because he feared Owen "was going to start shooting," he explained, he ran outside. Id. at 167.
¶ 16 Starr was outside when she heard a gunshot. She testified that she immediately ran back inside and "saw [Owen] laying on the ground and Ms. Grier above him, pulling at his jacket, calling him names." Id. at 249. Starr did not see Owen's hands. According to Starr, Owen "looked at [her] as if he knew he was dead. And he grabbed himself, and he went and hopped up and started to get out of there." Id. at 250-51.
¶ 17 Michaels was also present at the time of the gunshot, but she testified that she "wasn't paying attention" because she was busy looking for the missing car keys. 3 VRP (Apr. 12, 2007) at 457. She claimed that she "didn't know he had gotten shot until there was blood behind him on the wall." Id. Michaels testified that after the gun went off, Grier was "pulling on [Owen's] jacket like she was trying to take it off almost." Id. at 459. She did not recall seeing a gun. Owen, she testified, was "kind of just standing there" and "had his hands out in front of him." Id.
¶ 18 Starr followed her wounded fiancé outside. According to Starr, Grier said, "get her" and began to pursue Starr. 2 VRP (Apr. 11, 2007) at 252. Starr testified that she had to kick Grier to keep her at bay.
¶ 19 Michaels went outside shortly after the shooting to find Grier and Starr "wrestling on the ground." 3 VRP (Apr. 12, 2007) at 460. Michaels began to pursue Grier to keep her away from Starr. Michaels testified that Grier called her "a bitch and a lot of things," grabbed at her, broke her bracelet, followed her up the driveway, and claimed she could kill her. Id. at 461-62. After Michaels fled back into the house and locked the door behind her, Grier broke in through the window and followed her inside. Id. at 462.
¶ 20 Meanwhile, Starr got into her car and called 911, disregarding Nathan's frantic instructions to the contrary. She testified that while she was on the phone, she noticed a silver and black pistol lying on the driver's side floorboard of Owen's car.
¶ 21 The police arrived and surrounded Grier's home, where Grier proceeded to barricade herself for approximately four hours. Eventually, she was transported to the hospital and placed under arrest. Her blood alcohol level was 0.16.
¶ 22 Law enforcement officers found Owen lying on his back underneath a tree. Owen was later reported dead. Law enforcement officers recovered a shotgun and a silver and black pistol from Owen's car.
¶ 23 Grier was charged with second degree murder with a firearm sentencing enhancement. The amended information contained *1265 alternative charges of intentional homicide and felony murder, with assault as the predicate felony.
¶ 24 At trial, Robert Ramoso, a forensic pathologist, testified that Owen had died of a gunshot wound to the chest and that the fatal shot had been fired from a range of 3 to 18 inches. Terry Franklin, a forensic scientist, testified that the bullet that had killed Owen likely came from a Hi-Point firearm. He opined that the silver and black Taurus found in Owen's car had not been used in the fatal shooting. Similarly, Michael Zaro, a detective, testified that Owen could not have placed the silver and black pistol in the car after getting shot, given the pattern of bloodstains on the ground. Zaro also testified that he had not been able to locate the gun that had killed Owen.
¶ 25 Brian Johnson, a detective, testified that the silver and black Taurus found in Owen's car had seven rounds in the magazine but no rounds in the chamber. Franklin testified that because the Taurus automatically reloads after firing a shot, he would expect to find a bullet in the chamber if the gun had been fired on the evening in question, unless the gun were malfunctioning. He further testified that he found no signs of malfunction.
¶ 26 Jeremy Vahle, a police officer, testified that he did not observe any outward signs that would corroborate Grier's claims, shortly after the shooting, that she had been assaulted and punched in the face and neck.
¶ 27 Defense counsel originally proposed instructions on first and second degree manslaughter, in addition to instructions on second degree murder (including both felony murder and intentional but not premeditated homicide).[2] Later, defense counsel withdrew the manslaughter instructions without explanation. Defense counsel indicated that he had discussed this decision with Grier and that she had agreed; he did not indicate whose decision it was to withdraw these instructions. A colloquy ensued, in which the court asked Grier if she had agreed to withdrawing the lesser included offenses. She replied in the affirmative:
[DEFENSE COUNSEL]: Your Honor, 3 through 9 [proposed instructions on manslaughter], I'm withdrawing. And I have spoken to Ms. Grier about lesser includeds [sic], what all that means, and we are, after our discussion, not going to submit any lesser includeds. So that, I think, encompasses everything, 3 through 9.
THE COURT: This is something she agrees with; is that correct, Ms. Grier?
[GRIER]: Yes, ma'am.
THE COURT: 3 through 9 will be withdrawn. Thank you.
7 VRP (Apr. 26, 2007) at 852. The jury was instructed that to convict Grier of second degree murder, it would need to find that Grier had intended to cause Owen's death or had caused his death in committing second degree assault.[3] The court also instructed the jury as to justifiable homicide, including self-defense, defense of others, and homicide committed to prevent a felony against or in *1266 the presence of the defendant, and it indicated to the jury that justifiable homicide is a complete defense to criminal charges. The jury received no instructions on manslaughter.
¶ 28 In his closing argument, defense counsel argued that the State had not met its burden in proving that Grier was armed, let alone that she had shot Owen. In particular, defense counsel argued that Owen had taken both of Grier's nine-millimeter guns, leaving Grier without any guns in her possession at the time of the shooting. In support of this contention, Grier's attorney argued that because the silver and black gun had not been fired that evening, Owen must have had another gun in his possession when he fired a shot at the neighbor's house.
The last that you saw the guns, the two guns in the purse, they took them from her, [Owen] did. And he didn't fire the small one at the house. The best proof of that is that it was found without one in the chamber. So which one did he fire? It had to have been the other one. And no one saw a gun in [Grier's] hands.
8 VRP (Apr. 30, 2007) at 969. Grier's counsel also argued that the other parties would have taken both guns away from Grier had they been genuinely concerned about safety.
¶ 29 In addition, defense counsel argued that Grier lacked the requisite intent for second degree murder. Specifically, defense counsel argued that Grier was "anything but belligerent" vis à vis Owen and, to the contrary, she flirted with Owen throughout the evening. Id. at 949. "There is no evidence of her ever being the aggressor, no evidence of any ill will toward [Owen] until he started assaulting Nathan and then wouldn't leave the house and comes back, et cetera." Id. at 971.
¶ 30 In the alternative, defense counsel argued justifiable homicide, contending that Grier had shot Owen to defend herself or her son or to resist a felony. Specifically, defense counsel argued that Owen was committing both assault and robbery at the time of the shooting and that "[t]here is no reasonable parent that is going to watch their child be assaulted like this more than once and not do something about it." Id. at 973. Defense counsel also maintained that deadly force was reasonable under the circumstances.
It's a man against a woman, a guy who is a pretty good-sized guy, 29 years old. He has assaulted two women that night, his girlfriend and [Grier] earlier. He is drunk. Same blood alcohol as [Grier]. He fired a gun, believed to be armed, assaulted Nathan, put a gun in Nathan's mouth. She knew about the tire iron incident and gang affiliation.
Id. The jury found Grier guilty of second degree murder. The jury also returned a special verdict finding that Grier had not been armed with a firearm at the time of the offense. Grier received the maximum sentence of 220 months in prison, in addition to 24-48 months of community custody.
¶ 31 Grier appealed, alleging evidentiary error, ineffective assistance of counsel (on grounds other than the failure to request lesser included offense instructions), defects in the sentencing process, and procedural errors relating to competency to stand trial. Br. of Appellant at i-ii; Br. of Resp't at 1. In a handwritten "Statement of Additional Grounds" that accompanied defense counsel's brief, Grier asserted, without supporting evidence, that her attorney did not explain the option of including first and second degree manslaughter instructions. The Court of Appeals requested additional briefing as to whether the failure to request lesser included instructions constituted ineffective assistance of counsel. The Court of Appeals subsequently reversed defendant's conviction on ineffective assistance grounds, holding that defense counsel's failure to request lesser included instructions indeed amounted to ineffective assistance. State v. Grier, 150 Wash.App. 619, 208 P.3d 1221 (2009). The Court of Appeals denied the State's motion for reconsideration, and the State sought review by this court.

ANALYSIS
¶ 32 When an ineffective assistance claim is raised on appeal, the reviewing court may consider only facts within the record. State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995). While off-the-record *1267 conversations between Grier and her attorney may be germane to her ineffective assistance claim, Grier must file a personal restraint petition if she intends to rely on evidence outside of the trial record. Id.; Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."). Grier's claim that defense counsel had not consulted with her as to lesser included offenses finds no support in the record before us, and indeed, the record supports the contrary conclusion. Thus, in reviewing Grier's ineffective assistance claim, we must proceed on the basis that defense counsel consulted with Grier as to the exclusion of lesser included offenses and that Grier agreed to defense counsel's withdrawal of these instructions.
¶ 33 Citing Washington's Rules of Professional Conduct, the State argues that the decision whether to request instructions on lesser included offenses rests with the defendant after consultation with counsel. The State further argues that because Grier affirmatively agreed to forgo instructions on lesser included offenses, and because this decision rests with the defendant alone, Grier cannot fault her attorney for the decision to pursue an all or nothing approach. Suppl. Br. of Pet'r at 8-9. We disagree.
¶ 34 Part tactic, part objective, the decision to request or forgo lesser included offense instructions does not fall squarely within the defendant's sphere. Instead, the relative responsibilities of the defendant and her counsel in this decision making process are not clearly delineated. However, both American Bar Association (ABA) standards and Washington's Rules of Professional Conduct (RPCs) provide useful guidance as to the allocation of decision making power in this arena.[4]
¶ 35 The second edition of the ABA Standards for Criminal Justice stated that "the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses." ABA, Standards for Criminal Justice: Prosecution Function and Defense Function std. 4-5.2 cmt. at 4.68 (2d ed. 1980). However, this language does not appear in the third (and current) edition of this publication. ABA, Standards for Criminal Justice: Prosecution Function and Defense Function std. 4-5.2 cmt. (3d ed. 1993). Instead, the third edition provides a nonexhaustive list of decisions that rest solely with the defendant (entering pleas, accepting a plea agreement, waiving jury trial, testifying at trial, and appealing), as well as a nonexhaustive list of "strategic and tactical" decisions that should be made by defense counsel upon consultation with the defendant (selecting witnesses, conducting cross-examination, selecting jurors, making trial motions, introducing evidence). Id. Neither section mentions the decision to offer lesser included offense instructions. Id. However, under the "Strategy and Tactics" subheading of the commentary to Standards std. 4-5.2, the third edition notes that "[i]t is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury." Id. at 202.
¶ 36 This language, taken in conjunction with the deletion of the language from the second edition as to lesser included offenses, suggests that the decision to exclude lesser included offenses does not rest squarely with the defendant, and indeed, a number of courts have reached that conclusion. E.g., Ex Parte Mills, ___ So.3d ___, 2010 WL 3463487, at * 14 (Ala.2010) (for ineffective assistance purposes, ABA commentary suggests that decision to request lesser included instructions is for defense counsel); Arko v. People, 183 P.3d 555, 560 (Colo.2008) (decision to request lesser included instructions is a tactical decision that rests with defense counsel and requires consultation with defendant); Mathre v. State, 2000 ND 201, 619 N.W.2d 627, 629-31 (N.D.2000) (defense counsel's failure to consult with defendant as *1268 to lesser included offense instructions did not constitute ineffective assistance of counsel because the inclusion or exclusion of such instructions is a tactical decision reserved for defense counsel).
¶ 37 Similarly, under RPC 1.2 ("Scope of Representation and Allocation of Authority Between Client and Lawyer"), the decision to request lesser included offense instructions is absent from the list of decisions reserved to criminal defendants. Its absence suggests that this decision is not left wholly to criminal defendants. Cf. Arko, 183 P.3d at 559 (interpreting identical provision in the Colorado Rules of Professional Conduct); Simeon v. State, 90 P.3d 181, 184 (Alaska Ct.App. 2004) (interpreting identical provision in Alaska Rules of Professional Conduct); see also In re Pers. Restraint of Stenson, 142 Wash.2d 710, 735, 16 P.3d 1 (2001) ("`For many reasons, therefore, the choice of trial tactics, the action to be taken or avoided, and the methodology to be employed must rest in the attorney's judgment.'" (quoting State v. Piche, 71 Wash.2d 583, 590, 430 P.2d 522 (1967))).
¶ 38 In sum, Washington's RPCs, as well as standards promulgated by the ABA, indicate that the decision to exclude or include lesser included offense instructions is a decision that requires input from both the defendant and her counsel but ultimately rests with defense counsel. Thus, Grier's agreement to forgo lesser included offense instructions does not bar her ineffective assistance claim.
¶ 39 Although we conclude that Grier has not waived her challenge, we also conclude that her claim of ineffective assistance is without merit. In holding otherwise, the Court of Appeals sharply deviated from the standard for ineffective assistance the United States Supreme Court announced in Strickland. Today, we reaffirm our adherence to Strickland, reject the three-pronged test the Court of Appeals used to analyze Grier's claim, and reject Grier's ineffective assistance claim under the Strickland standard.
¶ 40 The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland, 466 U.S. at 685-86, 104 S.Ct. 2052; State v. Thomas, 109 Wash.2d 222, 229, 743 P.2d 816 (1987). In Strickland, the United States Supreme Court set forth the prevailing standard under the Sixth Amendment for reversal of criminal convictions based on ineffective assistance of counsel. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Under Strickland, ineffective assistance is a two-pronged inquiry:
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction... resulted from a breakdown in the adversary process that renders the result unreliable."
Thomas, 109 Wash.2d at 225-26, 743 P.2d 816 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052); see also State v. Cienfuegos, 144 Wash.2d 222, 226, 25 P.3d 1011 (2001) ("Washington has adopted the Strickland test to determine whether a defendant had constitutionally sufficient representation.").
¶ 41 Under this standard, performance is deficient if it falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel in the course of representation. To prevail on an ineffective assistance claim, a defendant alleging ineffective assistance must overcome "a strong presumption that counsel's performance was reasonable." State v. Kyllo, 166 Wash.2d 856, 862, 215 P.3d 177 (2009). Accordingly, the defendant bears the burden of establishing deficient performance. McFarland, 127 Wash.2d at 335, 899 P.2d 1251.
¶ 42 "When counsel's conduct can be characterized as legitimate trial strategy *1269 or tactics, performance is not deficient." Kyllo, 166 Wash.2d at 863, 215 P.3d 177; State v. Garrett, 124 Wash.2d 504, 520, 881 P.2d 185 (1994) ("[T]his court will not find ineffective assistance of counsel if `the actions of counsel complained of go to the theory of the case or to trial tactics.'" (quoting State v. Renfro, 96 Wash.2d 902, 909, 639 P.2d 737 (1982))). Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that "there is no conceivable legitimate tactic explaining counsel's performance." State v. Reichenbach, 153 Wash.2d 126, 130, 101 P.3d 80 (2004); State v. Aho, 137 Wash.2d 736, 745-46, 975 P.2d 512 (1999). Not all strategies or tactics on the part of defense counsel are immune from attack. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Roe v. Flores-Ortega, 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (finding that the failure to consult with a client about the possibility of appeal is usually unreasonable).
¶ 43 To satisfy the prejudice prong of the Strickland test, the defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." Kyllo, 166 Wash.2d at 862, 215 P.3d 177. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Thomas, 109 Wash.2d at 226, 743 P.2d 816; Garrett, 124 Wash.2d at 519, 881 P.2d 185. In assessing prejudice, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law" and must "exclude the possibility of arbitrariness, whimsy, caprice, `nullification' and the like." Strickland, 466 U.S. at 694-95, 104 S.Ct. 2052.
¶ 44 Ineffective assistance of counsel is a fact-based determination that is "generally not amenable to per se rules." Cienfuegos, 144 Wash.2d at 229, 25 P.3d 1011; Strickland, 466 U.S. at 696, 104 S.Ct. 2052 ("Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.").
¶ 45 Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
¶ 46 This court has not addressed whether the failure to offer jury instructions on lesser included offenses may amount to ineffective assistance. However, Grier is one of several Court of Appeals decisions addressing this issue. Respondent relies heavily on State v. Ward, 125 Wash.App. 243, 104 P.3d 670 (2005) and State v. Pittman, 134 Wash.App. 376, 166 P.3d 720 (2006), two Division One opinions that figured prominently in Division Two's decision in Grier. Suppl. Br. of Resp't at 6-9; Grier, 150 Wash.App. at 641, 208 P.3d 1221.
¶ 47 In State v. King, 24 Wash.App. 495, 601 P.2d 982 (1979), a decision predating Strickland, the Court of Appeals held that the decision not to request a lesser included instruction on simple assault was a legitimate all or nothing tactic that did not amount to ineffective assistance of counsel. Ward, however, appears to be the first Washington case to address this issue since we adopted the Strickland standard. In Ward, Division One set forth a three-pronged test for determining whether defense counsel's failure to request a lesser included instruction satisfied the deficient performance prong of Strickland. Ward, 125 Wash.App. at 249-50, 104 P.3d 670. First, the court compared the potential sentences for the greater and lesser offenses and found a significant discrepancy. Id. at 249, 104 P.3d 670. Second, the court determined that the defenses for the greater and lesser offenses were the same and, therefore, that an instruction on the lesser offense would not have been detrimental to the defendant's case. In particular, the court *1270 found that defendant's self-defense theory applied to both offenses. Id. at 249-50, 104 P.3d 670. Third, the court found that an "all or nothing" approach was risky given the facts of the case. Id. at 250, 104 P.3d 670. On balance, the court held that defense counsel's all or nothing approach was "objectively unreasonable" and therefore failed the deficient performance prong of the Strickland test. Id. ("In these circumstances, we can see no legitimate reason to fail to request a lesser included offense instruction. The all or nothing strategy exposed Ward to a substantial risk that the jury would convict on the only option presented, two second degree assaults.").
¶ 48 In this case, the Court of Appeals applied the three-part test developed in Ward (and subsequently appearing in Pittman) and found that defense counsel's failure to instruct the jury on lesser included offenses amounted to deficient performance. Grier, 150 Wash.App. at 645, 208 P.3d 1221 ("As the court in Pittman warned, the lack of lesser included instructions, where warranted by the evidence, puts in an untenable position a jury that is convinced beyond a reasonable doubt that she has committed a crime: The jury wants to hold the defendant culpable and to convict her of some crime, but is only given one option, here, second degree murder" (citing Pittman, 134 Wash.App. at 387-88, 166 P.3d 720)).
¶ 49 In so holding, the Court of Appeals relied heavily on a passage from Keeble v. United States, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973).
"[I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction."[5]
Grier, 150 Wash.App. at 643, 208 P.3d 1221 (quoting Keeble, 412 U.S. at 212-13, 93 S.Ct. 1993); see also Ward, 125 Wash.App. at 250-51, 104 P.3d 670 (quoting same passage); Beck v. Alabama, 447 U.S. 625, 634, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (quoting same passage outside the ineffective assistance context).
¶ 50 In addition, the Court of Appeals cited the jury's arguably incongruous verdict (finding that defendant was guilty of second degree murder but not armed with a firearm at the time of the offense) in support of its conclusion that the absence of lesser included offense instructions had created a difficult predicament for the jury. Grier, 150 Wash. App. at 645, 208 P.3d 1221 ("This untenable position manifested itself here in the jury's anomalous verdicts.... These seemingly contradictory verdicts support an inference that the jury believed Grier should be held accountable for causing Owen's death but that it also had reservations about her level of culpability.").
¶ 51 After applying the three-part test for the deficient performance prong and making an affirmative finding, the Court of Appeals found that the prejudice prong of the Strickland test had been satisfied as well. Id. (finding "reasonable probability" that outcome would have differed had defense counsel not withdrawn lesser included offenses). Thus, it reversed Grier's conviction on ineffective assistance grounds. Id. at 646, 208 P.3d 1221; see also Ward, 125 Wash.App. at 251, 104 P.3d 670 (finding that jury's inquiry during deliberations suggested reasonable probability that jury would have selected lesser offense, if given); Pittman, 134 Wash. App. at 390, 166 P.3d 720 (applying three-part Ward test and finding "reasonable likelihood" that jury would have convicted of lesser offense if given opportunity); In re Pers. Restraint of Crace, 157 Wash.App. 81, 109, 236 P.3d 914 (2010) (finding all or nothing *1271 strategy to be an unreasonable trial tactic in light of the disparity in potential sentences for the lesser and greater offenses); State v. Breitung, 155 Wash.App. 606, 620, 230 P.3d 614 (2010)[6] (applying three-part Ward test and finding all or nothing strategy unreasonably risky where evidence fell short of proving greater crime but could not support an acquittal); State v. Smith, 154 Wash.App. 272, 278, 223 P.3d 1262 (2009) (holding that all or nothing strategy was not a legitimate trial tactic where defense counsel did not present sufficient evidence to support acquittal).
¶ 52 More recently, Division One has retreated from the three-pronged Ward test. In Hassan, the court found that an all or nothing strategy was a legitimate trial strategy because inclusion of the lesser included offense would have weakened the defendant's claim of innocence. State v. Hassan, 151 Wash.App. 209, 221, 211 P.3d 441 (2009) ("On this record, because the only chance for an acquittal was to not request a lesser included instruction, we conclude that the decision to pursue an all or nothing strategy was not objectively unreasonable."). The Hassan court parted company with Ward and Pittman, arguing, inter alia, that those decisions deviated from the presumption of effectiveness announced in Strickland. Id. at 221 n. 6, 211 P.3d 441; cf. State v. King, 24 Wash. App. at 501, 601 P.2d 982 (defense counsel was not ineffective in pursuing "an all-or-nothing tactic that well could have resulted in acquittal."). We agree.
¶ 53 The three-pronged test developed in Ward and applied in this case distorts the Strickland standard. First, as the Hassan court aptly noted, the Ward decision is insufficiently deferential. Hassan, 151 Wash. App. at 221 n. 6, 211 P.3d 441 ("[W]e agree with the State's argument that [Ward and Pittman] do not properly take into consideration the strong presumption of effective assistance in determining whether the decision to seek acquittal was a legitimate trial strategy."); see Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'" (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955))).
¶ 54 In particular, the first two factors of the Court of Appeals' test tip the scales in favor of deficient performance, despite the Strickland presumption of effective assistance. The first factor, a significant discrepancy between penalties for the greater and lesser offenses, likely will be present in all ineffective assistance claims of this nature; a lesser included offense always carries a lighter sentence.[7] Similarly, the second factor, whether the defenses are the same for the greater and lesser offenses, is generally satisfied and, thus, also weighs heavily in favor of deficient performance.
¶ 55 The third prong of the Court of Appeals' inquiry is troubling for a number of reasons. Perhaps most importantly, by authorizing courts to make an objective determination as to whether a given level of risk is acceptable, it overlooks the subjective nature of the decision to pursue an all or nothing approach. A defendant who opts to forgo instructions on lesser included offenses certainly has more to lose if the all or nothing strategy backfires, but she also has more to gain if the strategy results in acquittal. Even where the risk is enormous and the chance of acquittal is minimal, it is the defendant's prerogative to take this gamble, provided her attorney believes there is support for the decision. Just as a criminal defendant with slim chances of prevailing at trial may reject a plea bargain nevertheless, a *1272 criminal defendant who genuinely believes she is innocent may prefer to avoid a compromise verdict, even when the odds are stacked against her. Thus, assuming that defense counsel has consulted with the client in pursuing an all or nothing approach, a court should not second-guess that course of action, even where, by the court's analysis, the level of risk is excessive and a more conservative approach would be more prudent.
¶ 56 The division of labor between the attorney and client, discussed in detail in the preceding section, sheds further light on the fundamental flaws inherent in the third prong of the Court of Appeals' test. The inclusion or exclusion of lesser included offense instructions is a tactical decision for which defense attorneys require significant latitude. At the same time, the ABA's emphasis on client participation in this decision making process reinforces the subjective nature of this decision and suggests that courts should be loath to second-guess the defendant's approach, risky or not. In sum, the complex interplay between the attorney and the client in this arena leaves little room for judicial intervention.
¶ 57 The Court of Appeals further erred in relying on hindsight. In citing the inconsistent jury verdict as evidence of an unreasonable level of risk, the court used hindsight to assess the reasonableness of defense counsel's performance and in so doing, ran afoul of Strickland. Grier, 150 Wash.App. at 645, 208 P.3d 1221 ("This untenable position manifested itself here in the jury's anomalous verdicts."); Strickland, 466 U.S. at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").
¶ 58 Finally, the Court of Appeals' reliance on Keeble was misplaced. Grier, 150 Wash. App. at 643, 208 P.3d 1221 (citing Keeble, 412 U.S. at 212-13, 93 S.Ct. 1993). Keeble addressed lesser included offenses in the context of the defendant's request for a lesser included instruction, not a decision by defendant to forgo such an instruction. Keeble, 412 U.S. at 206, 93 S.Ct. 1993. Specifically, Keeble centered on the Indian Major Crimes Act of 1885, 18 U.S.C. §§ 1153, 3241, which allowed Indians charged with certain offenses to be prosecuted in federal court, even when the alleged offense took place in Indian country. Id. at 205-06, 93 S.Ct. 1993. At issue was whether an Indian prosecuted in federal court pursuant to this statute was entitled to an instruction on a lesser included offense, where the lesser offense was not among the enumerated offenses giving rise to federal jurisdiction under the statute. Id. at 206, 93 S.Ct. 1993. In holding that lesser included offense instructions were a procedural safeguard to which Indian and non-Indian defendants were entitled, the Supreme Court set forth the language that the Court of Appeals would repeatedly bring to bear on ineffective assistance claims. E.g., Grier, 150 Wash.App. at 643, 208 P.3d 1221; Ward, 125 Wash.App. at 250-51, 104 P.3d 670. However, Keeble is inapposite in the context of ineffective assistance of counsel.
¶ 59 Applied to ineffective assistance claims, Keeble skews the Strickland standard. In Strickland, the Court indicated that, "[i]n making the determination as to whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
¶ 60 In relying on Keeble, however, the Court of Appeals assumed that the jury would not hold the State to its burden in the absence of a lesser included offense instruction. See Keeble, 412 U.S. at 212-13, 93 S.Ct. 1993; Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Had the Court of Appeals instead assumed the jury would follow the law by convicting Grier of second degree murder only where the State had proved each of the required elements beyond a reasonable doubt, it would not have found that the absence of a manslaughter instruction led to an erroneous conviction. Indeed, the proposed manslaughter instructions instructed the jury not to consider manslaughter if convinced beyond a reasonable doubt that Grier was *1273 guilty of second degree murder. Clerk's Papers at 59 ("If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crimes of Manslaughter in the First Degree or Manslaughter in the Second Degree."). Because the jury returned a guilty verdict, we must presume that the jury found Grier guilty beyond a reasonable doubt of second degree murder.
¶ 61 Autrey v. State, 700 N.E.2d 1140, 1142 (Ind.1998), an Indiana case finding that counsel was not ineffective in pursuing an all or nothing approach, is particularly instructive in this regard.
The jury found defendant guilty of murder beyond a reasonable doubt. Had the jury been instructed on lesser included offenses to murder, they would have been presented with the same evidence and heard the same testimony. Therefore, there is no reason to believe that the inclusion of lesser included offenses would have raised a reasonable doubt as to defendant's culpability for murder.
¶ 62 Applying the Strickland test to the facts of this case, we hold that Grier fails to meet her burden to show that counsel provided ineffective representation. As the Court of Appeals correctly concluded, Grier is entitled to instructions on lesser included offenses if she requests them. In State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978), we set forth a two-pronged test to determine whether a criminal defendant is entitled to an instruction on a lesser included offense. "First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed." (Citation omitted.) Grier meets this standard; the elements of manslaughter are necessary elements of second degree murder, and the evidence in this case supports an inference that Grier committed manslaughter. However, a defendant who is entitled to lesser included instructions may choose to forgo such instructions nevertheless. The salient question here is not whether Grier is entitled to such instructions but, rather, whether defense counsel was ineffective in forgoing such instructions.
¶ 63 Strickland begins with a "strong presumption that counsel's performance was reasonable." Kyllo, 166 Wash.2d at 862, 215 P.3d 177. To rebut this presumption, the defendant bears the burden of establishing the absence of any "conceivable legitimate tactic explaining counsel's performance." Reichenbach, 153 Wash.2d at 130, 101 P.3d 80 (emphasis added). Although risky, an all or nothing approach was at least conceivably a legitimate strategy to secure an acquittal.
¶ 64 At trial, Grier's attorney argued that the State had not proved beyond a reasonable doubt that Grier was armed at the time Owen was shot, let alone that she had shot him intentionally. In the alternative, he argued that Grier had shot Owen in self-defense, or as a means to protect her son or prevent a felony, namely an assault or robbery. Under either of these theories, acquittal was a real possibility, albeit a remote one. No one saw Grier shoot Owen. No one saw a weapon, nor did police recover one after an extensive search of Grier's property. Indeed, evidence that the silver and black gun found in Grier's car was not fired on the day of the incident suggests that Owen may have been in possession of both of Grier's nine-millimeter guns at the time of the shooting, leaving Grier without a murder weapon. Owen's violent and perhaps threatening behavior in the moments leading up to his death provided support for defense counsel's justified homicide theory. Grier knew about Owen's gang involvement and violent tendencies, and she knew that Owen had threatened her son at gunpoint earlier in the evening. Furthermore, she saw what Owen had done to her son's face and was evidently distraught by what she saw. In addition, she knew that Owen had taken possession of her shotgun and likely had reason to suspect that he had taken another gun as well.
¶ 65 Consequently, Grier and her defense counsel reasonably could have believed that an all or nothing strategy was the best approach to achieve an outright acquittal. *1274 Cf. Knowles v. Mirzayance, ___ U.S. ___, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (rejecting ineffective assistance claim based on defense counsel's "withdrawal of what he reasonably believed was a claim doomed to fail"). That this strategy ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052; cf. State v. Hoffman, 116 Wash.2d 51, 112, 804 P.2d 577 (1991) ("The defendants cannot have it both ways; having decided to follow one course at trial, they cannot on appeal now change their course and complain that their gamble did not pay off."). In sum, Grier cannot meet her burden of proving deficient performance.
¶ 66 Nor can Grier establish prejudice under the second prong of Strickland. Assuming, as this court must, that the jury would not have convicted Grier of second degree murder unless the State had met its burden of proof, the availability of a compromise verdict would not have changed the outcome of Grier's trial. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 ("a court should presume... that the judge or jury acted according to law"); Autrey, 700 N.E.2d at 1142 (availability of manslaughter would not have affected outcome where jury found defendant guilty of murder beyond reasonable doubt).
¶ 67 Our holding is in line with those of other jurisdictions that have rejected ineffective assistance claims based on defense counsel's failure to request instructions on lesser included offenses. E.g., Autrey, 700 N.E.2d at 1142 (where acquittal was a realistic goal, "the decision not to tender lesser included offenses was a tactical decision, not an error"); Heinlin v. Smith, 542 P.2d 1081, 1082 (Utah 1975) (finding defense counsel's failure to request lesser included offenses "to be a not unreasonable, but a likely tactic involving the idea that counsel quite conscientiously may have concluded should be an all-or-nothing stance that better might lead to an outright acquittal, rather than a probable misdemeanor conviction"); Tinsley v. Million, 399 F.3d 796, 808 (6th Cir.2005) (where primary defense in homicide case was that defendant was not the shooter, "it was a permissible exercise of trial strategy not to request [lesser included] instructions"); United States ex rel. Sumner v. Washington, 840 F.Supp. 562, 573-74 (N.D.Ill.1993) (omission of lesser included manslaughter instruction not ineffective assistance "under the highly deferential analysis" set forth in Strickland); Moyer v. State, 275 Ga.App. 366, 374, 620 S.E.2d 837 (2005) (all or nothing approach is a tactical decision that cannot give rise to ineffective assistance claim), overruled on other grounds sub nom. Vergara v. State, 283 Ga. 175, 178, 657 S.E.2d 863 (2008); Parker v. State, 510 So.2d 281, 287 (Ala.Crim.App.1987) ("Under these circumstances, counsel reasonably could have believed that it would be a bad tactical choice to offer lesser included offense instructions to give the jury the alternative of choosing a lesser included offense if it felt uneasy about convicting on the charge of murder"); Grant v. State, 696 S.W.2d 74 (Tex.Ct.App.1985) (failure to request lesser included offense instructions not ineffective assistance); Beasley v. Holland, 649 F.Supp. 561, 567 (S.D.W.Va.1986) (counsel reasonably could have believed that lesser included offense instruction was a poor strategic decision).
¶ 68 Finally, the State contends that the Court of Appeals decision requires trial courts to provide lesser included instructions sua sponte in the absence of a request for such instructions. Suppl. Br. of Pet'r at 19. Such a rule would be an unjustified intrusion into the defense prerogative to determine strategy and, accordingly, we reject this requirement.

CONCLUSION
¶ 69 We hold that Grier's acquiescence in the decision to exclude lesser included offense instructions does not preclude her from claiming ineffective assistance of counsel. However, under the standard the United States Supreme Court set forth in Strickland, the withdrawal of jury instructions on lesser included offenses did not constitute ineffective assistance. Because the Court of Appeals found Grier's ineffective assistance claim dispositive and thus did not reach Grier's other claims of error, we vacate the Court of Appeals' decision reversing Grier's *1275 conviction on ineffective assistance grounds, and we remand to the Court of Appeals for adjudication of Grier's remaining claims.
WE CONCUR: CHARLES W. JOHNSON, GERRY L. ALEXANDER, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, DEBRA L. STEPHENS, Justice, and RICHARD B. SANDERS, Justice Pro Tem.
NOTES
[1] In his initial statement to the police, Nathan stated unequivocally that Owen had been armed at the time of the shooting. 2 VRP (Apr. 11, 2007) at 170.
[2] The proposed manslaughter instructions read, in relevant part:

Instruction No. 3
The defendant is charged with Intentional Murder in the Second Degree and, alternatively, with Felony Murder in the Second Degree. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crimes of Manslaughter in the First Degree or Manslaughter in the Second Degree.
When a crime has been proved against a person, and there exists a reasonable doubt as to which of two or more crimes that person is guilty, he or she shall be convicted only of the lowest crime.
Instruction No. 4
A person commits the crime of manslaughter in the first degree when he or she recklessly causes the death of another person unless the killing is excusable or justifiable.
....
Instruction No. 7
A person commits the crime of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person unless the killing is excusable or justifiable.
Clerk's Papers at 59-64.
[3] The jury was required to be unanimous in finding Grier guilty of second degree murder, but unanimity as to the particular alternativeintentional homicide or felony murderwas not required.
[4] See Strickland, 466 U.S. at 688, 104 S.Ct. 2052 (while guidelines promulgated by professional organizations are not dispositive, they may provide guidance in determining what is reasonable conduct on the part of defense counsel).
[5] The State and the Hassan court erroneously characterize this passage as dicta. See Suppl. Br. of Pet'r at 11; State v. Hassan, 151 Wash. App. 209, 221 n. 6, 211 P.3d 441 (2009).
[6] We have deferred the petition for review of Breitung, pending resolution of this case.
[7] The Court of Appeals in Hassan suggested otherwise, focusing on the discrepancy in absolute terms between the sentence lengths for the lesser and greater offenses at issuethree months and six months, respectively. However, had the court instead focused on the discrepancy in relative terms, it would have found a significant discrepancy; the sentence for the greater offense was twice as long as the sentence for the lesser offense. Hassan, 151 Wash.App. at 219-20, 211 P.3d 441.