# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  56507-2-II |
| Respondent, | |
| v. | |
| CHAISE CHRISTOPHER MCGRIFF, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Chaise C. McGriff appeals his convictions and sentence for first degree robbery while armed with a firearm, unlawful imprisonment while armed with a firearm, and first degree unlawful possession of a firearm.  McGriff argues that he received ineffective assistance of counsel and the trial court erred by imposing community custody supervision fees.

We hold that McGriff did not receive ineffective assistance of counsel, but the trial court erred by imposing community custody supervision fees.  Accordingly, we affirm McGriff's convictions, reverse the imposition of community custody supervision fees, and remand to the trial court to correct the judgment and sentence by striking the imposition of community custody supervision fees.

## FACTS

Nicholas Quijano met two women in a motel room.  Two men came out of the motel room bathroom and robbed Quijano.  One of the men and one of the women took Quijano to a car and drove him to a park, where they left him.  Quijano went to a nearby house and contacted law enforcement.

Law enforcement investigated by speaking with Quijano and viewing surveillance videos from the motel. Based on the investigation, law enforcement identified McGriff as a suspect in the robbery. Law enforcement brought McGriff in for questioning and showed McGriff surveillance photos from the motel. McGriff identified himself in a surveillance photo. McGriff also told law enforcement that he had been in the motel room where the incident had occurred. However, McGriff said he left before Quijano arrived and did not participate in the robbery.

The State charged McGriff with first degree robbery while armed with a firearm, first degree kidnapping while armed with a firearm, and first degree unlawful possession of a firearm.[1]

Before trial, the State moved to admit McGriff's statements to law enforcement. Specifically, the State sought to admit McGriff's statements that he was at the motel on the date of the incident and that the surveillance photo showed McGriff at the motel. The defense did not object to the admission of these statements. The trial court allowed the admission of McGriff's statements to law enforcement.

At trial, the State presented testimony from Quijano and law enforcement officers who investigated the robbery and eventually arrested McGriff. The State also presented surveillance videos from the motel. McGriff did not testify.

---

[1] On the first degree kidnapping charge, the defense successfully requested a jury instruction on the lesser charge of unlawful imprisonment.

Quijano testified that he went to a motel to meet with Danielle Carter, who he knew from junior high and high school. Quijano and Carter had previously engaged in sexual relations with each other. Carter was married to McGriff's brother, Zachary.[2]

Quijano went to the motel because he intended to have sex with Carter and her friend.[3] When Quijano went into the motel room, the women started undressing Quijano, and Quijano got up to use the bathroom. When Quijano pushed the bathroom door open, two men came out. The men put guns in Quijano's face, hit him in the face, and pepper sprayed him. The pepper spray impaired Quijano's vision for about 15 minutes. The men took Quijano's wallet, gun, cell phone, and car keys. One of the men said, "'You knew I was going to get you eventually for sleeping with my wife.'" 2 Verbatim Report of Proceedings (VRP) (Oct. 27, 2021) at 117.

Quijano described the men as wearing hats and masks. One man was wearing a red hat and all red clothing. The other man was wearing a black and red hat, black shirt, and black shorts with white trim. The State showed Quijano a surveillance photo from the motel, and Quijano identified the man in black as Zachary and the man in red as McGriff. Quijano also testified that the two men in the surveillance photo were the same men in the motel room on the day of the incident. Quijano identified McGriff in the courtroom as having been one of the men in the motel room. Quijano testified that he saw a lanyard around McGriff's neck both in the surveillance photo and on the night of the incident.

---

[2] Zachary and the defendant share the same last name, McGriff. For clarity, we refer to Zachary by his first name and to the defendant by his last name. We intend no disrespect.

[3] Carter identified her friend as "Leslie," but Carter's friend was McGriff's girlfriend or wife Rebecca Hilton. 2 Verbatim Report of Proceedings (VRP) (Oct. 27, 2021) at 112.

Quijano also testified that Zachary and Carter instructed Quijano to follow them to a car and to act like nothing was wrong. Quijano complied. Zachary and Carter got into the car with Quijano. Zachary told Quijano that Zachary's brother was going to take Quijano's car and go through it. Zachary and Carter drove Quijano to a park. At the park, Zachary took Quijano behind a tree, told Quijano to get on the ground, and left Quijano there.

Quijano went to a nearby house where he contacted law enforcement. Quijano made verbal statements to the police that evening and made a written statement to police a few days after the incident. Quijano did not mention McGriff by name because he did not know McGriff's name at that time.[4] Law enforcement showed Quijano a photo montage, and Quijano identified Zachary but not McGriff as being in the motel room.

After the incident, Quijano used Facebook to look up individuals who were related to Zachary so he could find who robbed him. Quijano found McGriff and determined that he was Zachary's brother. Quijano recognized McGriff on Facebook as being one of the men who robbed him.

Detective Selena Banales of the Fife Police Department testified that she went to the motel and learned that Carter had rented the motel room where the robbery occurred. Detective Banales also watched surveillance videos from the motel. The surveillance videos, admitted at trial, show a man in a red shirt, black shorts, red hat, and lanyard. The red shirt says, "NEVER FOLD," in large text, and the red hat has large black letters on it. Ex. 1, 20200806200600.exe, ch. 18, at 20:19:04. The surveillance videos show the man in red getting out of a gold Crown Victoria during

---

[4] Quijano had not met McGriff before the incident, but Quijano knew Zachary and looked up McGriff on Facebook after the incident.

the daytime. The surveillance videos also show a man at nighttime with the same skin tone and build wearing a red shirt that says, "NEVER FOLD," in large text, black shorts, and red hat with large black letters on it. Ex. 1, 20200806215825.exe., ch. 18, at 21:58:30.

By viewing the surveillance videos, Detective Banales determined that the gold Crown Victoria was associated with the motel room. Detective Banales identified McGriff as being a registered owner of the gold Crown Victoria at the motel. Based on her identification of McGriff as the owner of the gold Crown Victoria, along with the view of the man's face in the videos, Detective Banales testified that the man in the red hat and red shirt in the surveillance footage was McGriff. Detective Banales also identified McGriff in the nighttime surveillance footage, which was taken around the time of the robbery.

Detective Banales testified that the surveillance footage showed McGriff leaving the motel room a few minutes before Quijano left the room. Detective Banales also testified that the surveillance footage showed Carter, Hilton, and Zachary coughing. Detective Banales stated that the coughing might have been caused by the pepper spray. On cross-examination, the defense asked Detective Banales whether she saw McGriff cough at all, and Detective Banales testified, "possibly," when McGriff first left the motel room. 4 VRP (Nov. 1, 2021) at 344. The defense also asked Detective Banales about her personal experiences being pepper sprayed and asked if she observed McGriff having watery eyes or a runny nose when leaving the motel room. Detective Banales testified that she could not tell.

Detective Banales further testified that the Fife Police Department put out a bulletin for the gold Crown Victoria. Officers pulled over the gold Crown Victoria a few days after the incident.

5

McGriff and Hilton were in the car. Law enforcement searched the car and found Quijano's firearm in the glove box. Officers arrested then interviewed McGriff.

Detective Tobin Volkman and Sergeant Thomas Thompson of the Fife Police Department testified regarding McGriff's interview. In the interview, McGriff stated that he had been present at the motel on the date of the incident and that he was in the motel room in question. However, McGriff stated that he left the motel before the robbery occurred. During the interview, officers showed McGriff surveillance photos from the motel. McGriff identified himself in a daytime surveillance photo. McGriff pointed out a lanyard around his neck in the surveillance photo and stated that the same lanyard was attached to his keys when he was pulled over.

During direct examination, the State showed Detective Volkman a nighttime surveillance photo, and Detective Volkman testified that he recognized McGriff in the photo. In that nighttime surveillance photo, the man in question was wearing the same clothing as in another surveillance photo that was taken earlier in the day where McGriff identified the person in the surveillance photo taken earlier in the day as being him.

In closing arguments, the defense argued that Quijano's story had evolved and that Quijano misremembered McGriff being in the room during the robbery. The defense also argued that the surveillance video showed McGriff outside of the motel room, but it did not show McGriff with Quijano at any point. The defense reminded the jury of Detective Banales' testimony regarding the effects of pepper spray. The defense asked the jury to review the surveillance footage and make its own determination of whether McGriff showed symptoms of being pepper sprayed. The defense argued that, if someone was walking around with clear eyes and without coughing, it would suggest they were not in the room when the pepper spray was deployed.

The jury found McGriff guilty of first degree robbery while armed with a firearm and first degree unlawful possession of a firearm. The jury found McGriff not guilty of first degree kidnapping while armed with a firearm but found him guilty of the lesser crime of unlawful imprisonment while armed with a firearm.

The trial court sentenced McGriff to 208 months' total confinement. At the sentencing hearing, the trial court found McGriff indigent and stated that it would "waive all the discretionary costs."[5] VRP (Sentencing) at 13. In the judgment and sentence, the trial court crossed off the DNA collection fee and criminal filing fee. The trial court attached an appendix regarding community corrections that included boilerplate language imposing community custody supervision fees.

McGriff appeals.

## ANALYSIS

A.    INEFFECTIVE ASSISTANCE OF COUNSEL

McGriff argues that he received ineffective assistance of counsel because his attorney failed to object to Detective Banales' testimony identifying McGriff in the motel surveillance footage. Specifically, McGriff takes issue with the failure to object to Detective Banales' identification of McGriff in the surveillance footage that was taken at or around the time of the robbery. We disagree.

Criminal defendants are guaranteed the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington

---

[5] The judgment and sentence does not reflect this indigency finding. The section regarding McGriff's ability to pay financial obligations was left blank.

7

Constitution. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). We review ineffective assistance of counsel claims de novo. *State v. Lopez*, 190 Wn.2d 104, 116-17, 410 P.3d 1117 (2018). To prevail on an ineffective assistance of counsel claim, a defendant must establish that counsel's performance was deficient and that counsel's deficient performance prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. An ineffective assistance of counsel claim fails if a defendant fails to establish either prong. *Id.* at 33.

Counsel's performance is deficient if it falls "'below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "There is a strong presumption that counsel's performance was reasonable." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant can overcome the presumption of reasonableness by showing that "'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). If counsel's conduct can be characterized as a legitimate trial strategy or tactic, then counsel's performance is not deficient. *Id*.

Counsel's decision of when to object is a "classic example of trial tactics." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). "A few or even several failures to object are not usually cause for finding that an attorney's conduct has fallen below the objective standard of conduct." *Id.* at 250. Instead, we presume "that the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007).

Here, the defense's main argument at trial was that McGriff was not in the room when the robbery occurred. To further this argument, the defense asked Detective Banales about the effects

of pepper spray and whether the surveillance video showed McGriff exhibiting any symptoms of being pepper sprayed. Detective Banales testified that the surveillance footage showed the other three suspects coughing, but her testimony about McGriff coughing was more equivocal. In closing, the defense asked the jury to view the surveillance footage and determine whether McGriff showed signs of being pepper sprayed when he left the motel room a few minutes before Quijano. The defense suggested that if McGriff had clear eyes and was not coughing, he was likely not in the room when the pepper spray went off.

To make this argument, the defense had to establish that McGriff was the person shown in the surveillance footage leaving the room before Quijano left. Detective Banales testified that McGriff was that person in the surveillance footage. Because Detective Banales' identification testimony advanced the defense's argument that McGriff left the room before the pepper spray was deployed, counsel's decision to not object to Detective Banales' testimony identifying McGriff in the surveillance footage can be characterized as a legitimate trial strategy or tactic. Therefore, counsel's failure to object was not deficient performance, and McGriff's ineffective assistance of counsel claim fails.

B.      COMMUNITY CUSTODY SUPERVISION FEES

McGriff argues that the trial court erred by imposing community custody supervision fees. We agree.

The State argues that McGriff has failed to preserve this issue by failing to object to the community custody supervision fees below. Because McGriff failed to object below, he is not entitled to review of this issue as a matter of right. *See* RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."). However, because

9

of the negative effect of legal financial obligations (LFOs) on indigent defendants, Washington courts "regularly exercise their discretion to reach the merits of unpreserved LFO arguments." *State v. Glover*, 4 Wn. App. 2d 690, 693, 423 P.3d 290 (2018); *State v. Ortega*, 21 Wn. App. 2d 488, 498, 506 P.3d 1287 (2022). Therefore, we exercise our discretion to review McGriff's claim.

Here, at sentencing, the trial court expressed an intention to waive all discretionary "costs." VRP (Sentencing) at 13. At the time of McGriff's crime, trial, and sentencing, community custody supervision fees were discretionary LFOs but not "costs."[6] *State v. Bowman*, 198 Wn.2d 609, 629, 498 P.3d 478 (2021); *State v. Starr*, 16 Wn. App. 2d 106, 109, 479 P.3d 1209 (2021).

The record as a whole shows that the trial court intended to waive all discretionary LFOs and inartfully referred to those LFOs as "costs." The trial court orally found McGriff indigent and stated that it would "waive" all the discretionary costs. VRP (Sentencing) at 13. Further, the community custody supervision fees were imposed in an appendix containing boilerplate language, which, in the context of the proceedings, suggests that the imposition of the community custody supervision fees was unintentional. Because the record as a whole makes clear that the trial court intended to waive discretionary LFOs, we hold that the trial court erred in imposing the community custody supervision fees.

We affirm McGriff's convictions, reverse the imposition of community custody supervision fees, and remand to the trial court to correct the judgment and sentence by striking the imposition of community custody supervision fees.

---

[6] We note that the legislature recently amended RCW 9.94A.703, the statute that authorized the imposition of community custody supervision fees. LAWS OF 2022, ch. 29, § 8. The statute no longer authorizes trial courts to impose community custody supervision fees. LAWS OF 2022, ch. 29, § 8.

No. 56507-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Glasgow, C.J.

Veljacic, J.