FILED
COURT OF APPEALS
STATE OF WASHINGTON

2015 MAR 30 AM 9: 1



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70859-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JAMES EARL TUCKER, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 30, 2015 |

SCHINDLER, J. — A jury convicted James Earl Tucker of assault of F.T. in the third degree. Tucker appeals, arguing his attorney provided ineffective assistance by failing to object at trial to the references F.T. made to past incidents of domestic violence. Because Tucker cannot demonstrate prejudice, his claim of ineffective assistance of counsel fails, and we affirm.

## FACTS

James Earl Tucker and F.T. married in 1998. Ten years later, the couple divorced. Tucker and F.T. remained friends after the divorce. Tucker visited F.T. at her studio apartment in Seattle every day and stayed overnight several times a month.

In November 2012, a Harborview Medical Center hand surgeon performed surgery on Tucker's right thumb to "return[ ] the joint to its stable position." Two weeks after surgery, the splint Tucker wore was replaced with a hard fiberglass cast.

Tucker called F.T. "several times" during the night of December 4 to let her know he was on his way to her apartment. Tucker arrived at the apartment building around 1:30 a.m. on December 5. F.T. went downstairs to let him inside.

Tucker wanted to talk about past issues in their relationship. F.T. wanted to go to bed and suggested they wait until the morning to talk. Tucker got angry. Tucker and F.T. argued for about an hour before Tucker went to take a shower.

While Tucker was in the shower, F.T. tried to go to sleep. But after Tucker got out of the shower, he started arguing with her again. F.T. testified that as Tucker approached her while she was on the bed, he "made a motion" that made her think he was about to hit her. F.T. said, "[S]o now you want to hit me." When F.T. stood up, Tucker hit her several times in the face with his right hand and the arm in the fiberglass cast. After F.T. fell back onto the bed, Tucker grabbed her and squeezed her neck until she could not breathe. F.T. struggled to free herself and Tucker let her go. After he let her go, F.T. was on the floor on her hands and knees. Tucker kicked F.T. in the chest and ribs. After kicking her, Tucker said, "[L]ook what you made me do." Tucker then told F.T. to get an ice pack to put on her swollen eye and told her to tell people that she fell or ran into a wall.

F.T. went to the bathroom and used a t-shirt to soak up the blood from her cut lip. F.T. took photographs of her swollen face and the t-shirt with her cell phone before taking a shower. Tucker fell asleep while F.T. was in the shower. After making sure Tucker was asleep, F.T. took her keys, identification, and cell phone, went downstairs to the lobby, and called 911.

Seattle Police Department Officer Richard Jackson, Officer Jeff Dotson, and fire department medics arrived a few minutes later. Officer Dotson took a photograph of F.T.'s facial injuries. The medics gave F.T. oxygen and transported her to the hospital in an ambulance. Officer Jackson and Officer Dotson found Tucker asleep inside F.T.'s apartment and arrested him.

The next day, F.T. gave a statement to Detective Pam McCammon. Detective McCammon also took photographs of F.T.'s injuries.

The State charged Tucker with assault of F.T. in the third degree in violation of RCW 9A.36.031(1)(d). The information also alleged Tucker committed the crime "against a family or household member."

A number of witnesses testified during the trial, including F.T., Officer Jackson, and hand surgeon Dr. Chris Allan. The court admitted into evidence photographs of F.T.'s injuries and Tucker's fiberglass cast.

Officer Jackson testified that he and Officer Dotson found Tucker "asleep on either a bed or sofa" inside F.T.'s apartment. Officer Jackson said he "didn't notice any intoxication" while he was arresting Tucker. Officer Jackson testified that he could not fit handcuffs around the fiberglass cast and Tucker was "fairly cooperative."

F.T. testified that after the divorce, Tucker remained her "best friend." F.T. said Tucker visited her "daily" and they were still intimate. F.T. testified that under the apartment building rules, Tucker was allowed to stay overnight "up to eight days" each month. F.T. said that while Tucker was recovering from hand surgery, she received permission to let Tucker "stay for extra days" so he would not be "out in the shelters."

F.T. testified that when Tucker arrived at her apartment building at 1:30 a.m. on December 5, he appeared to be "under the influence" and "really couldn't look me in my eye." F.T. testified that she knew Tucker was "high" because on December 1, she gave him $630 to "go get his drug of choice. . . . Cocaine." F.T. testified that although they used cocaine together during their marriage, she has been "clean" for the past four years.

F.T. testified that Tucker became angry because she did not want to talk until the next morning. F.T. said Tucker insisted on talking about "things we had done in the past. Things that I thought we had talked about and cleared up and we moved on." F.T. testified that when Tucker was choking her, she thought "he was trying to kill me." In response to a question about how she was able to get free, F.T. testified, "I really don't know. . . . I might have said I love you." When asked why she waited two hours after the assault to call 911, F.T. said, "Because I don't want him chasing me down the hall where I lived at. And I know from the past experience, when this happened, I wait until he fall asleep. This is my first time ever coming out speaking about this."

On cross-examination, defense counsel asked F.T. to clarify whether "this was the first time you ever talked about any incident between you and Mr. Tucker." F.T. answered, "I tried to do it once before. But I allowed him to sweet talk me into not pressing charges on him once before. This is the first time I am ever doing this, yes."

The defense called Dr. Allan to testify. Dr. Allan said that before the surgery, Tucker "had dislocation of the [carpal meta-carpal] joint of the right thumb." Dr. Allan described Tucker's post-surgery cast as "a short arm thumb spike cast" with an "outer surface" of firm fiberglass. Dr. Allan testified the purpose of the cast was to "restrain the

hand against moving" and to "immobilize" the thumb. Dr. Allan stated the cast gave Tucker "40 degrees of motion" in the "last joint" of his thumb and left the other four fingers free "for flexion and extension of all four of the nonthumb digits."

On cross-examination, Dr. Allan testified that "[w]ith the exception of the thumb," it is "possible" for a patient "in that cast" to close the hand into a fist. Dr. Allan testified he could "state with medical certainty" that "the joint had not redislocated" but admitted he "did not have certainty" that Tucker's right hand had not been involved in "any trauma" since the surgery. Dr. Allan testified, "[T]he hand could be used for any number of things without the cast or the pins being moved."

In closing argument, the State argued F.T.'s testimony was credible and there was no evidence "that would indicate [F.T.] had fallen" or had been assaulted by another person. The State also pointed out Dr. Allan's testimony that the cast did not make it impossible to form a fist and that Dr. Allan could not say with medical certainty that Tucker's right hand was not involved in trauma after surgery.

The defense conceded that F.T. was injured on December 5 but asserted the State did not prove beyond a reasonable doubt that Tucker committed the assault. The defense asserted that F.T.'s testimony was not credible. The defense claimed Officer Jackson's testimony that he "didn't notice any intoxication" contradicted F.T.'s testimony that Tucker was "under the influence" of cocaine when he arrived at her apartment. The defense also argued the lack of scratches or imprints on F.T.'s neck contradicted her testimony that Tucker used the fiberglass cast to choke her.

5

The jury found Tucker guilty as charged of assault in the third degree and returned a special verdict finding that Tucker and F.T. are "members of the same family or household." The court imposed a "Special Drug Offender Sentencing Alternative."

ANALYSIS

Tucker seeks reversal of his conviction, arguing his attorney provided ineffective assistance by not objecting to F.T.'s testimony referring to past incidents of domestic violence. Tucker also asserts his attorney should have moved to strike as unresponsive F.T.'s answer to the question about whether this was the first time she "talked about any incident" between her and Tucker.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on a claim of ineffective assistance of counsel, Tucker must demonstrate (1) deficient performance, that his attorney's representation fell below the standard of reasonableness, and (2) resulting prejudice, that there is a reasonable probability that but for counsel's deficient performance, the outcome of the proceedings would have been different. Strickland v Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). If a defendant fails to establish either prong, we need inquire no further. Kyllo, 166 Wn.2d at 862.

Tucker cannot establish prejudice. Even where defense counsel fails to object to "damaging and prejudicial evidence" of prior bad acts, a defendant claiming ineffective assistance of counsel must show that "the admission of the objectionable evidence prejudiced [the defendant]'s right to a fair trial." State v. Hendrickson, 129 Wn.2d 61,

78-80, 917 P.2d 563 (1996). We consider the "prejudicial effect of the jury's knowledge" of the defendant's prior bad acts "against the backdrop of the evidence in the record." Hendrickson, 129 Wn.2d at 80. If the remaining evidence "powerfully supports" a finding of guilt, "we cannot state that the result of the trial court would have been different" had the "objectionable evidence" not been admitted. Hendrickson, 129 Wn.2d at 80.

To convict Tucker of assault in the third degree, the State had the burden of proving beyond a reasonable doubt that Tucker, "[w]ith criminal negligence, cause[d] bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm." RCW 9A.36.031(1)(d).

The undisputed evidence establishes F.T. was injured the morning of December 5, 2012. Officer Jackson testified that when he arrived at around 6:00 a.m., F.T. "had facial injuries," including a "pretty swollen" left eye, and injuries "around her mouth, her lip, lips were swollen." Photographs taken by Officer Dotson and Detective McCammon show cuts on F.T.'s lower lip and her left eye is swollen shut.

The evidence established Tucker committed the assault. F.T. testified that her apartment building has a security guard and guests must ring a bell and wait for a resident to come downstairs to let them inside. When police arrived, F.T. was waiting in the lobby and told them Tucker was still inside her apartment sleeping. Officer Jackson testified that he and Officer Dotson found Tucker asleep inside F.T.'s apartment.

Tucker claims he has established prejudice because the evidence shows he could not hit F.T. with his arm in the cast without reinjuring his thumb joint, there was no

blood on the cast, and there were no imprints of the cast on F.T.'s neck. Dr. Allan's testimony does not support his argument.

Dr. Allan testified it is "possible" to form a fist in the cast without the thumb, and "the hand could be used for any number of things without the cast or the pins being moved." Dr. Allan testified that he could not state with medical certainty that Tucker's hand had not been involved in "any trauma" since surgery. Dr. Allan also testified that "[f]iberglass can take a lot. So I don't think that there would be any evidence on the cast of almost anything." When asked whether pressing a cast against the neck would leave marks, Dr. Allan said that it "depends" on a number a factors, including "the orientation of the cast with respect to the neck," the "timing thereof," and "the magnitude of the pressure." Dr. Allan testified it is "conceivable" that "an imprint might be left on the skin which would be transient, temporary."

The cases Tucker relies on, State v. Saunders, 91 Wn. App. 575, 958 P.2d 364 (1998), and State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), are inapposite. In Saunders, defense counsel purposefully elicited testimony about the defendant's prior criminal conviction. Saunders, 91 Wn. App. at 580. In Escalona, we held the court abused its discretion by denying the defense motion for a mistrial based on a witness's unsolicited testimony that the defendant previously stabbed someone else. Escalona, 49 Wn. App. at 253, 256.

Because Tucker cannot establish prejudice, his ineffective assistance of counsel claim fails, and we affirm.[1]

WE CONCUR:

_____

_Schindler, J._

_____

Cox, J.

---

[1] In a statement of additional grounds, Tucker makes the same ineffective assistance of counsel argument. Tucker also challenges the sufficiency of the evidence and argues the court erred in admitting hearsay evidence. Sufficient evidence supports the conviction. The court did not abuse its discretion in allowing the fire department medic and the police officer to testify about conversations with F.T. when they responded to the 911 call.