FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2019 FEB -5 AM 10: 57

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77408-5-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MATTHEW LEE GORDON, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 5, 2019 |

SCHINDLER, J. — A jury convicted Matthew Lee Gordon of three counts of assault in the first degree, assault in the second degree, unlawful possession of a firearm in the first degree, and tampering with a witness. Gordon argues ineffective assistance of counsel deprived him of his Sixth Amendment right to a fair trial. Because Gordon cannot establish prejudice, we affirm the jury verdict.

In 2016, S.S. and Matthew Gordon were in a romantic relationship. S.S. lived with Gordon and his mother in their two-story house. Security cameras were mounted on the north and south sides of the house with a "live feed" of the driveway and exterior of the house.

S.S. and Gordon were fighting "all the time" near the "end of [the] relationship." By June, S.S. and Gordon were no longer involved in a romantic relationship. However, S.S. continued to live with Gordon and his mother.

S.S. and J.T. started dating. On June 29, 2016, S.S. called and asked J.T. to pick her up from Gordon's house. When J.T. arrived, he saw S.S. "running down the center of the street." S.S. was "frantic . . . , really upset." S.S. told J.T., "[W]atch out, he's got a gun." J.T. looked back and saw a man "all dressed in black" in "a shooter's stance." J.T. saw "a little puff of smoke come out of the end of whatever he was holding." S.S. got in J.T.'s truck and they drove to his condominium. The next day, J.T. found a bullet hole in the tailgate of his truck. The bullet "went through my toolbox" that was in the back of the truck near the "driver's compartment."

S.S. showed her mother C.L. "marks on her arms" and told C.L. that Gordon "started threatening her with a gun" and playing "Russian roulette with her."

On July 4, S.S. told Kirkland Police Officer Pete Lawrence that on June 29, Gordon "started punching me over and over." S.S. said Gordon "put his .22 caliber handgun in my mouth" and said, " 'I'm gonna kill you.' " S.S. signed a written statement under oath. The police took photographs of her injuries. The photographs show "bruises all over [her] body" and "on [her] face," "a burn mark" on her back, and "bruising on the top of her foot," her ankle and her legs "from the knees down," her left wrist, and her elbow. S.S. had a "chip in her front right top tooth."

J.T. told the officers about the bullet hole in his truck. Corporal Kimberly Baxter inspected the truck and saw the bullet went through the tailgate and into "the toolbox in the back of the pickup." Corporal Baxter found a bullet "inside the toolbox."

On July 6, S.S.'s mother C.L. went to Gordon's house to check on S.S. C.L. said she "knew" that Gordon had been "touching my daughter, hurting her, and that he'd been threatening her." C.L. told Gordon that if he "laid a hand on" S.S., she would "kill

2

him." Gordon said, "[W]e'll see about that" and walked away. Gordon returned dressed in army fatigues, holding a "long rifle type of gun." Gordon shot the rifle at C.L.'s feet "five or six times."

C.L. drove to her boyfriend R.A.'s house. C.L. told R.A. what happened and "begged him to go get my daughter." R.A. went to Gordon's house "to get [S.S.] out of there." When he pulled up to the house, Gordon's friend came out. R.A. told him to tell S.S. to "pack her stuff. . . . [S]he's coming with me." S.S. left with R.A. S.S. stayed at R.A.'s house that night but left the next day. C.L. "was concerned" S.S. had returned to Gordon's house.

On July 7, R.A. and C.L. drove to Gordon's house "to see if [S.S.] was back there." R.A. parked his truck across the street and "played my music pretty loud so [Gordon would] come out." "[A]ll of a sudden," R.A. saw Gordon "run out with an assault rifle," "cock it back," and "point it at" him. The rifle had "a silencer on it." R.A. "hit the gas" and "pushed [C.L.]'s head down." R.A. "saw the flash" "from the tip of the gun." R.A. and C.L. drove to the Kirkland police station.

The police obtained a warrant to search Gordon's house. The police executed the warrant on July 8. The police found "a multitude of rifles and suppressers and ammunition" downstairs. The police seized "[m]ultiple gun parts" and "gun accessories," including "long rifles, handgun magazines," "rifle rated body armor," and "improvised explosive devices." The police found "bullet holes all over the house," including "the back side of the garage" and the "exterior of the home." The police also seized the surveillance videos.

Detective John Ishmael transferred the surveillance video footage to an external hard drive. The surveillance camera footage went "back to . . . June 29, 2016."

On July 12, 2016, the State charged Gordon with assault in the first degree of S.S. and J.T. with a semi-automatic handgun between June 29, 2016 and July 11, 2016 in violation of RCW 9A.36.011(1)(a); domestic violence assault in the second degree of S.S. with a semi-automatic handgun between June 29, 2016 and July 11, 2016 in violation of RCW 9A.36.021(1)(c); domestic violence felony harassment of S.S. while armed with a semi-automatic handgun between June 29, 2016 and July 11, 2016 in violation of RCW 9A.46.020(1) and (2)(b); and unlawful possession of a firearm in the second degree in violation of RCW 9.41.040(2)(a)(i).

On July 13, the police arrested Gordon while he was in his Toyota Camry. Gordon told the officers that "everything was fine with him and [S.S.] and that they were going to get married." Gordon told the police he did not have "weapons" in the Toyota Camry.

The police obtained a warrant to search the Toyota Camry. Evidence technician Tiffany Borges and Detective Tyler Davidson seized "three weapons in the back of the trunk, . . . two rifles and a handgun"; "ammunition underneath the seat"; and "bullets throughout . . . the car."

In a recorded telephone call from the King County jail, Gordon told his mother, "The Toyota had all my guns in it."

On August 2, 2016, the State filed an amended information also charging Gordon with assault in the first degree of C.L. with a rifle on or about July 6, 2016 in violation of

4

RCW 9A.36.011(1)(a) and assault in the first degree of R.A. with a rifle on or about July 7, 2016 in violation of RCW 9A.36.011(1)(a).

In January 2017, Gordon mailed a letter to his friend Alex Moseid and wrote "legal mail" on the envelope. The third page of the letter states:

Al this is for your eyes only Burn it After you Read it

this trial will go much smoother if [R.A.], [C.L.], [S.S.], [J.T.], Ken and [R.A.']s sister [A.A.] do Not talk to any one and do Not make it to trial. even if I have to owe some one a million dollars that has a shovel and is willing to use it.

On February 13, Gordon called Moseid and asked if he "talked to [C.L.] or anybody." Gordon said, "I don't really know what . . . they're planning on doing. I mean, right now, I'm going to trial, but . . . [i]f they show up, I mean." Moseid said, "Yeah, you don't have to say nothing about that, what I understand you're saying, so . . . [.] But I can look into it for you, I mean."

On August 16, 2017, the State filed an amended information to also charge Gordon with tampering with a witness between June 29, 2016 and March 8, 2017 in violation of RCW 9A.72.120. The State amended the charges of assault in the first degree of C.L. to assault in the second degree of C.L. with a rifle on or about July 6, 2016 in violation of RCW 9A.36.021(1)(c) and unlawful possession of a firearm in the second degree to unlawful possession of a firearm in the first degree in violation of RCW 9.41.040(1).

The court read the charges against Gordon to the jury venire, including the charge of unlawful possession of a firearm in the first degree:

That the defendant Matthew Lee Gordon in King County, Washington, between June 29, 2016 and July 13, 2016, previously having been convicted in King County, Washington of the crime of Burglary in the

Second Degree, a serious offense as defined in RCW 9.41.010, knowingly did own, have in his possession, or have in his control, a black semi-automatic handgun, a firearm as defined in RCW 9.41.010;

Contrary to RCW 9.41.040(1), and against the peace and dignity of the State of Washington.

During voir dire, juror 25 said burglary in the second degree was "a rather serious offense." Defense moved for a mistrial. The court denied the motion. Juror 25 was not a member of the jury panel that heard the case.

More than 15 witnesses testified at trial, including S.S., J.T., C.L., and R.A. The court admitted into evidence the security system videotape recordings on June 29, July 6, and July 7; photographs of S.S.'s injuries; and jail telephone calls.

S.S. testified she did not want to testify and did not "come here on [her] own free will." S.S. admitted "something happened to me" on June 29. When the prosecutor asked if she was "hurt during that incident," S.S. said, "I don't know. I — I don't like — I just, I can't really do this. I don't know. I don't really want to do this." S.S. testified, "Just even, just thinking about that, an incident that I've, like, blanked out of my memory and it's like for a reason, like I just feel like I just, I, like, can't. I can't do this. I don't know how to explain it."

After viewing photographs of her injuries, S.S. testified:

I had just a lot of bruising on my body, and . . . [.] Wow. Looking at the pictures, I had a lot of bruises all over my body and a mark on my face and a mark on my back. Wow. I have a lot of marks all over my body.

S.S. admitted she was "hit in the face on my left eyebrow." S.S. said she did not know "who hit [her] in the face." S.S. looked at the photographs and said, "I got hit in my mouth, and there's a little chip on my tooth." S.S. testified she did not remember "what item chipped [her] tooth."

6

S.S. admitted she told Officer Pete Lawrence that Gordon "put his 22-caliber handgun in my mouth" and "[w]hen he jammed the suppresser in my mouth, it chipped my front tooth." S.S. conceded she told Officer Lawrence that Gordon "was saying, I'm going — I'm gonna kill you, and threatening to bash my skull in."

> When [Gordon] pulled the gun on me, and put it in my mouth, after he threatened saying you're gonna die, he had his finger on the trigger. After he pulled the barrel of the suppresser out of my mouth, he shot the gun into the ceiling of the garage.
> Before cutting — putting the gun in my mouth, he was punching and kicking me. He hit, struck me with a large, round candle. Then he seemed to feel that did nothing. So he started punching me over and over. I was curled into a ball on the ground and he was hitting me.

S.S. also told Officer Lawrence that Gordon "struck me in the face on my right eye. He had a ring on and it made a mark. I've lost count of how many times he has physically abused me. Multiple times." S.S. also said, "Multiple times he's pointed a gun at me. The last few months he's becoming more violent at me." S.S. told Officer Lawrence, "I'm terrified of [Gordon]. I'm scared that he is going to kill me if he finds out I've talked to the police."

J.T. identified Gordon as the person who shot at his truck on July 7. J.T. testified the man was "about 30 feet" away and he was "able to actually see the person who shot at" him.

C.L. testified that when Gordon fired the rifle at her feet on July 6, "I was scared. I thought I was dead for a second." C.L. said she "saw [Gordon] shoot the gun" at R.A.'s truck the next day on July 7.

The State played the surveillance camera videos for the jury. The June 29 video shows S.S. in the driveway "light up a cigarette and pass it to somebody who's just off of camera." The video shows the cigarette is "thrown" at "her face" and S.S. walking

7

down the driveway toward the street, "holding her head." Approximately a minute later, the video shows Gordon at the back deck of his house with "what appears to be a semiautomatic pistol with a suppressor attached to it in his left hand." As Gordon walks along the south side of the house toward the street, the video shows the "headlights of [J.T.] driving past the house" in his truck. As J.T. drives by, Gordon raises his pistol and starts to run, "chasing after the pickup truck."

The July 6 video shows the "confrontation between [C.L.] and [Gordon] on the front lawn." Gordon is "wearing full army fatigues and army hat." C.L. "appears to be yelling at him."

The July 7 video shows R.A.'s "very distinct pickup truck" driving "southbound past the house." The truck "comes back . . . 20, 30 seconds later and then parks across the street." C.L. is in the passenger seat. They wait "about 40 seconds" and "never exit the vehicle." Gordon runs "to the street" and "fires at least three rounds at the vehicle as it speeds away."

On the third day of trial, Gordon stipulated "for the purpose of the unlawful possession of a firearm charge" that he had been convicted of a prior serious offense. The court read the stipulation to the jury:

> The parties stipulate that on or about March 20, 2008, the defendant, Matthew Lee Gordon, was convicted of a serious offense in 08-1-07721-3 SEA and was properly notified orally and in writing that he was not to possess, own, or have in his control a firearm.

The jury found Gordon guilty of domestic violence assault in the first degree of S.S. while armed with a firearm, domestic violence assault in the second degree of S.S. while armed with a firearm, assault in the first degree of J.T. while armed with a firearm, assault in the first degree of R.A. while armed with a firearm, unlawful possession of a

firearm in the first degree, and tampering with a witness. The jury found Gordon not guilty of assault in the second degree of C.L.

Gordon seeks reversal, claiming his attorney provided ineffective assistance of counsel by not seeking to exclude any reference to his prior burglary conviction and not entering into the stipulation before voir dire.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We review claims of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To establish a claim of ineffective assistance of counsel, Gordon must show (1) deficient performance that fell below an objective standard of reasonableness and (2) but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. Strickland, 466 U.S. at 687. If either prong of the test is not satisfied, our inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

After the court read the charging information to the jury venire, juror 25 "mentioned Mr. Gordon's prior conviction for burglary in the second degree, indicating that it was a . . . rather serious offense."

Defense moved for a mistrial. Defense counsel stated he did not object when the court read the information to the jury because he "didn't want to call . . . undue attention

9

to that particular charge or . . . to the unlawful possession of a firearm charge." Defense counsel told the court:

> Although it wasn't the subject of a pre-trial motion, it's — it was my intention and my practice in this particular charge to stipulate to the defendant previously — having previously been convicted of a serious offense, which, as we know, keeps out the name of the crime and keeps out, you know, any of the details, keeps out the judgment and sentence and that kind of thing.

The court denied the motion for a mistrial. The court ruled:

> Unfortunately, [defense counsel], had you — had you brought that up in advance, the court certainly would have considered it, but given that you didn't, I read the charges as they were written, and I'm not going to grant a mistrial on that basis.

Even if the failure to stipulate to a prior serious offense before voir dire constitutes deficient performance, Gordon cannot establish prejudice; that but for the failure to enter into a stipulation before jury voir dire, the result of his trial would have been different. The evidence of guilt was overwhelming and the court instructed the jury that it could not consider the prior conviction "for any purpose." Jury instruction 8 states:

> As to Counts 1, 2, 3, 4, 5, and 7 you may not consider evidence that the defendant has been convicted of a crime for any purpose.
> As to Count 6 [unlawful possession of a firearm in the first degree] you may consider evidence that the defendant has been convicted of a crime in deciding whether the State has proven each element of that crime and for no other purpose.

We presume the jury follows the court's instructions. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). Because Gordon cannot show prejudice, he cannot establish ineffective assistance of counsel.

Gordon contends and the State concedes that the judgment and sentence contains a clerical error. We accept the concession. The jury found Gordon guilty of

10

three counts of assault in the first degree, assault in the second degree, unlawful possession of a firearm in the first degree, and witness tampering. However, the judgment and sentence states Gordon was found guilty "by Plea." We remand to correct the clerical error in the judgment and sentence. See CrR 7.8(a); RAP 7.2(e); State v. Davis, 160 Wn. App. 471, 478, 248 P.3d 121 (2011).

We affirm the jury conviction but remand to correct the clerical error in the judgment and sentence.

WE CONCUR:

_Schwell, J._

_Dwyer, J._                         _Andrus, J._