**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76250-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| TYE PATRICK FLEISCHER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 22, 2019 |
| | ) | |

MANN, A.C.J. — Tye Fleischer appeals his convictions for two counts of aggravated first degree murder, one count of attempted first degree murder, and one count of unlawful possession of a firearm. Fleischer argues that he received ineffective assistance of counsel based on defense counsel's failure to object to three photographs that depict a tattoo of the word "DAMAGE" across Fleischer's upper chest. Because Fleischer is unable to show that the result of his trial would have been different had the photographs not been admitted into evidence, we affirm.

I.

On February 13, 2015, Fleischer fired 10 rounds from a semiautomatic pistol through Kevin Odneal's fence, killing Odneal and Irene Halverson and seriously injuring

Brittany Wilson. Fleischer started using methamphetamines when he was 12 years old and had battled addiction since. Fleischer and Odneal had known each other for years. At the time of the murders, Wilson and Fleischer both lived in the same clean and sober house. Halverson had never met Fleischer.

Prior to February 13, 2015, Fleischer was trying to get control of his addiction. He had attended inpatient drug treatment, was living in a clean and sober household, and was gainfully employed. About a week prior to the shooting, however, Fleischer relapsed on methamphetamines, which caused him to become very depressed and hard on himself. Fleischer attributed this relapse, in part, to his belief that his clean and sober household was not, in fact, clean and sober. Wilson regularly invited known drug dealers, including Odneal, to the house. Fleischer also believed that Odneal had stolen tools from Fleischer's van and that Odneal had been in a sexual relationship with Fleischer's wife.

On February 12, 2015, Odneal was with Wilson in the kitchen at the clean and sober house when Fleischer flew down the stairs yelling at the two of them. Fleisher called Odneal a disposable waste. Fleischer later apologized to Wilson and attempted to apologize to Odneal as Odneal was leaving the room.

After Fleischer returned home from work on February 13, 2015, Larry Durler— Fleischer's friend and fellow resident of the clean and sober house—told Fleischer that Odneal had stopped by and wanted to speak with Fleischer. Fleischer then left the house and drove to Odneal's house. Odneal lived in a house with his mother. The house had a large driveway and detached garage. The property also had a large barely-transparent fence that separated the front and back parts of the driveway.

Just before Fleischer arrived at Odneal's property, Joseph Packard parked his truck on the street outside. Packard was friends with Halverson, and was intending to pick her up from Odneal's house.

According to the testimonies of Packard and Wilson, at approximately 7:00 p.m. Fleischer arrived at Odneal's property. After hesitating on the street, he drove his van into Odneal's driveway. Fleischer then rummaged around in his van for a few moments and walked towards Odneal's fence. Fleischer and Odneal spoke for a few moments. Odneal then walked back to the garage, where Wilson and Halverson were. Odneal explained to Wilson that Fleischer had arrived and wanted to apologize. Halverson, Wilson, and Odneal then left the garage and walked back towards the fence. At this point, Packard looked down into this own vehicle and did not look back up until he heard a loud pop, like a firecracker. He then saw Fleischer run back towards his van, turn around, and fire his handgun multiple times. Fleischer fired a total of 10 rounds, killing Halverson and Odneal, and seriously wounding Wilson.

Fleischer testified that he armed himself because he knew Odneal was angry with him and because he had seen Odneal become aggressive towards other people in the past. Further, Fleischer knew that Odneal's property was in a dangerous location where two other people had previously been murdered. He explained that upon arriving at Odneal's property, he told an unknown male at the fence that he needed to speak with Odneal. That man then walked back towards the garage. Then, Fleischer saw numerous people walking from the garage towards the fence. He started to become worried because he heard what he perceived to be threatening words. Fleischer then saw someone scurry off and thought he heard the sound of someone loading a shotgun.

Fleischer then heard a loud pop and felt an electric jolt, and believed he had just been shot. Fleischer testified that in response, he fired back towards the fence and fled the property.

Initially, Fleischer drove to his brother's house but because his brother and sister-in-law were not home, he left. He then drove to a church parking lot where he checked himself for bullet holes, finding none. During this time, Fleischer made numerous phone calls. First, he called his brother, Terrance Flynn. Fleischer told Flynn that he had done something bad, that he had shot two people. Fleischer also said he was going to kill himself. Flynn tried to talk Fleischer out of killing himself and to surrender to the police.[1]

Fleischer then called 911 and reported that he had shot two people. Fleischer explained that he was going to kill himself and was only calling so that the police found his body and not some children. The dispatcher asked: "Can you tell me what happened that caused the shooting?" Fleischer explained: "I'm just taking a couple of pieces of shit that fucking hurt and kill people out while I'm doing it, because I know people really well and I know these people have done it . . . . And, um, I'm not one to sit in prison for 15-20 years." The dispatcher asked if she could have a police officer call Fleischer back so that they could talk. Fleischer agreed.

Everett Police Department Captain Gregory Lineberry called Fleischer and attempted to engage Fleischer in a dialogue to get him to surrender and not kill himself. Lineberry was concerned that if Fleischer did not do so, more people would get injured, especially if someone were to accidentally come upon Fleischer. Lineberry explained

---

[1] At some point during this period of time, Fleischer also called Durler. Fleischer told Durler that he "screwed up . . . [but was] not going to get into details" about what happened.

-4-

that at one point Fleischer told him that "[i]t's okay to kill someone when they're selling drugs."

After speaking with Fleischer for some time, over numerous phone calls, Lineberry was able to convince Fleischer to surrender to the police. By this point, Fleischer had driven to Forest Park. After Fleischer told Lineberry where he was, Lineberry informed other officers who set up a perimeter around Fleischer's van. After discussing it with Lineberry, Fleischer ultimately exited his van, removed his shirt, and surrendered to police.

Fleischer was charged with two counts of aggravated murder in the first degree with a firearm, attempted first degree murder with a firearm, and unlawful possession of a firearm in the second degree. Fleischer was tried before a jury in December 2016.

The State called 20 witnesses to testify and introduced 211 exhibits, including Fleischer's 911 call and a surveillance video from a home surveillance system that Odneal owned. The evidence admitted included 187 photographs. Three of the exhibits were photographs of Fleischer's chest depicting a large tattoo of the word "DAMAGE."

The jury found Fleischer guilty of all charges after less than four hours of deliberation. Fleischer was sentenced to life in prison without the possibility of parole.

II.

Fleischer contends he was denied effective assistance of counsel because his counsel failed to object to the three photographs showing his "DAMAGE" tattoo and did not object to testimony and argument concerning the tattoo. We disagree.

The Federal and State Constitutions guarantee a criminal defendant the right to effective assistance of counsel. U.S. CONST. amend. VI; WASHINGTON CONST. art 1, § 22. To succeed on an ineffective assistance of counsel claim, the defendant must show both that their counsel's representation was deficient and that their counsel's deficient representation prejudiced the defendant. State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). We strongly presume that counsel's performance was competent, Grier, 171 Wn.2d at 32-33, and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

In the context of defense counsel's failure to object to evidence, the defendant must show (1) the absence of a legitimate strategic reason for not objecting; (2) that an objection likely would have been sustained; and (3) that the result of the trial would have been different if the evidence had not been admitted. State v. Hendrickson, 129 Wn.2d 61, 79-80, 917 P.2d 563 (1996). Here, even if we presume Fleischer can establish the first two elements, he is unable to show that there is a reasonable probability the result of his trial would have been different if the evidence and argument concerning his tattoo had not been admitted.

A.

First, the photographs, testimony, and argument concerning Fleischer's tattoo were minimal. Fleischer's trial theory was that he shot the three victims in self-defense on the mistaken belief that they were about to shoot him. The State had the burden of proving that the force Fleischer used was not lawful. The jury was instructed on all

-6-

aspects of self-defense, including lawful force, reasonably necessary force, lack of duty to retreat, and being entitled to act on appearance even if mistaken as to the threat a person perceives.

Fleischer asserts that the tattoo evidence dramatically reduced the odds that jurors would find he acted in self-defense because the tattoo portrayed him as one likely to premeditate murder. But the State never suggested that the jury should infer criminal conduct from the tattoo. The actual testimony concerning the tattoo was brief. Detective Taragan described Fleischer's behavior in his van before surrendering. Taragan testified that Fleischer was laughing and smoking cigarettes. Fleischer then exited the driver's seat, pulled off his shirt, and put his hands up. Taragan described Fleischer as "shirtless. He had the words 'danger' and 'Fleischer' tattooed on his body."[2] No other mention was made of the tattoo during testimony.

The only other mention of the tattoo came during the State's rebuttal closing argument:

> The defendant would often just use his fists. If he got mad at you, he'd punch you. That's what he did. "Damage" tattooed right across his chest. So what does it tell you that he resolved himself to drive over to this man's house in the middle of the night and put a fully loaded weapon in his waistband? Was it I didn't know what was going to happen? If that's true, call. Go the next day. Go during the day. You'd been there during the day a week before. What do you do if you've got a gun in your pocket? It's not because he didn't know what was going to happen, because he knew exactly what was going to go down that night. Exactly. More than a moment in time.

The context of the argument indicates that the single reference to the tattoo was a brief remark to differentiate that arming himself with a gun before confronting Odneal

---

[2] Taragan mistakenly referred to Fleischer's tattoo as "danger" instead of "damage."

was out of character for Fleischer—who admitted that he punched people if he had an issue with them—and evidence of premeditation.

### B.

Further, the evidence below indicates that even if the tattoo evidence was precluded, the jury would have reached the same verdict. Fleischer admitted to shooting Halverson, Wilson, and Odneal and argued only that he was justified in doing so because he was reasonably in fear for his life. Fleischer explained that he went to Odneal's house because he believed Odneal wanted to speak with him. Then, while near Odneal's fence, Fleischer heard what he believed to be threatening words, followed by a sound like someone was loading a shotgun, a loud pop from above, and then felt a jolt run through his body. Fleischer testified that in response, he pulled his gun from his waist and started firing.

But the overwhelming evidence introduced below indicates that Fleischer's version of the events was untrue. The evidence showed that upon arriving at Odneal's property, Fleischer armed himself with a loaded handgun—something very out of character for Fleischer, even when he had visited Odneal's property in the past—and that Fleischer exhibited severe animosity towards Wilson and Odneal in the days preceding their murder. Further, the jury watched the video of the shooting several times. The jury heard the audio of the 911 call where Fleischer explained that he had just shot two people, was going to kill himself, and was "just taking a couple pieces of shit that fucking hurt and kill people out while I'm doing it." And the jury heard Captain Lineberry's description of his conversation with Fleischer where Fleischer explained that "[i]t's okay to kill someone when they're selling drugs."

Fleischer's own testimony also undercut his self-defense theory. Fleischer admitted on direct examination that while Odneal had been aggressive towards others in the past, he had never shown such aggression towards Fleischer. Fleischer further said that he was not scared, but instead was "aware," when he arrived at Odneal's property that day, but nevertheless immediately armed himself: "I pulled the gun out . . . [a]s soon as I got to his house."[3]

Fleischer further admitted "the story that what happened to me doesn't match up to the video[,]" and that his memory of the night is "pretty hazy."[4] Fleischer testified on cross-examination that he wasn't sure what he said to Odneal the night of the murder and "Maybe that's an afterthought." To which the State responded, "[s]o you would agree that you are sort of creating things that—you're telling us things that you don't really know if they happened?" Fleischer answered: "Look, you take that night. You got me. You take Joe Packard that came in here . . . Then you take the video. And then Brittany Wilson. I'm completely confused, but I know what I felt during all of those times." And then in regards to the 911 call, the State asked: "So, once again, your memory of what happened is different than an actual recording . . . of [what happened]; correct?" To which Fleischer responded: "It's a little bit different, yes." And Fleischer agreed with the State that immediately after the murders, Fleischer spoke with four

---

[3] On cross-examination, Fleischer said "[a]t the time that you're talking about when I first got there, no, I wasn't scared. I might have been a little super aware[,]" yet he still decided to arm himself.

[4] The full quote actually implies that Fleischer himself may not have bought into the self-defense theory:

[State]: I'm trying to understand because, Tye, the story you're telling us doesn't match up with the video. So let's talk about that.

[Fleischer]: That's what I told my attorney. I told my attorney that the story that what happened to me doesn't match up to the video. That what I told her.

[State]: Right. And that's a problem, Tye, because you yourself admitted several times that your memory of what happened that night is pretty hazy; right?

[Fleischer]: It's pretty hazy, but it kind of does match up to the video.

people—Terrance Flynn, Larry Durler, the 911 operator, and Captain Lineberry—and never once mentioned that he was in fear for his life or believed that he had been shot.

Fleischer argues now that the improper admission of the tattoo significantly reduced the odds that the jurors would find Fleischer acted in self-defense because the tattoo shifted the jury's attention to Fleischer's general propensity towards criminality. But, other than the bare assertion that the word "DAMAGE" tattooed on Fleischer's chest portrayed Fleischer as more likely to premediate murder, Fleischer offers no explanation how an ambiguous word necessarily created an emotional response in the juror's minds that Fleischer was violent, aggressive, and likely to premediate murder.

Rather, the overwhelming evidence introduced at trial indicates that Fleischer went to Odneal's house intending to shoot Odneal and/or Wilson. Accordingly, Fleischer cannot show that had the photographs of his tattoo not been admitted the result in this case would have been different.

We affirm.

_Mann, ACJ_

WE CONCUR:

_Smith, J._

_Andrus, J._