IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38745-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JAMES LAWRENCE JACKSON-SMITH, | ) | |
| | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — James Jackson-Smith appeals his convictions for assault in the first degree and kidnapping in the first degree. He argues the trial court abused its discretion when it admitted a recorded jail call, and trial counsel was ineffective for not requesting a limiting instruction concerning that call.

We agree the trial court abused its discretion. The call had no relevance and its unfair prejudice could have been substantial. But it was not. The jury acquitted Mr. Jackson-Smith of attempted murder, the crime for which the evidence was offered, and the offensive comments he made in the recording were similar to his comments at trial.

We also conclude that defense counsel was not deficient because there was a legitimate

trial strategy for not requesting a limiting instruction.  We affirm.

FACTS

Starr Hernandez was working at the front desk of a motel when Mr. Jackson-

Smith, a guest, called and asked her to come to his room to unclog his toilet.  Ms.

Hernandez unclogged the toilet and, as she put the plunger in a bag, Mr. Jackson-Smith's

left arm went around her neck.  Over the next 5 to 10 minutes, Mr. Jackson-Smith choked

and strangled her.  He eventually let her go, and she was able to leave the room.

Photographs corroborated Ms. Hernandez's injuries, which consisted of bruises, injuries

to her face, and strangulation marks around her neck.  Later that morning, officers

arrested Mr. Jackson-Smith, who had fled by car.

*Trial*

The State charged Mr. Jackson-Smith with assault in the first degree, kidnapping

in the first degree, and attempted murder in the first degree.  Although the State called

several witnesses at trial, we limit our discussion to those necessary to resolve the issues

presented.

Elizabeth Gonzalez

Elizabeth Gonzalez testified that she worked the night audit shift the night before the attack. She recalled a number of interactions with Mr. Jackson-Smith and feeling apprehensive. He first called the front desk and asked her to bring up a plunger because his toilet was clogged. She told him to come to the front desk to pick up it up, and he did.

She testified that Mr. Jackson-Smith called again and asked her to go up to his room to pick up the plunger because he hurt his hip. She refused because she was the only employee working and had to be at the front desk.

Early the next morning, around 5:00 a.m., while she was prepping breakfast, he approached her and said he locked himself out of his room. She told him she could make a new key card, but he asked if it would be faster to have her come up and unlock the door. She declined and instead made a new key card. She planned on warning Ms. Hernandez about Mr. Jackson-Smith when her shift started that morning, but forgot.

Starr Hernandez

Ms. Hernandez testified that just after her shift began at 7:00 in the morning she received a call from Mr. Jackson-Smith asking for "Elizabeth." 1 Rep. of Proc. (RP) (Dec. 15, 2021) at 352. She responded that she was the front desk person for the morning and asked if she could help. He told her he needed assistance unclogging his toilet. He

3

said he tried to unclog it but fell and broke the plunger.  He asked her to come up to his room to help him, and she agreed.  She grabbed a lanyard, which had the master keys for the motel, placed it around her neck, grabbed the plunger, and went to Mr. Jackson-Smith's room.

When Mr. Jackson-Smith opened the door, she told him it was motel policy that he not be inside the room while she was fixing the toilet.  He reluctantly agreed and stood outside.  Once inside the bathroom, Ms. Hernandez saw the toilet full of unused toilet paper and clear water.  It looked to her like it was intentionally clogged.

She unclogged the toilet and, as she was placing the plunger in a bag, she felt Mr. Jackson-Smith place his left arm around her neck.  He said, "'Shush.  It's okay.  It'll all be over soon.'"  1 RP (Dec. 15, 2021) at 361.  He then began to apply immense pressure to her neck.  At that moment, she thought he was trying to kill her.

She struggled and clawed Mr. Jackson-Smith's arms, and he dragged her out of the bathroom while she screamed.  She recalled being on the floor with him grabbing the lanyard around her neck and strangling her with it and him repeatedly bashing her head against the floor.  During the attack, he was very calm.  She thought at that moment she was going to die.  One of Mr. Jackson-Smith's hands was covering her mouth, so she bit it.  This caused him to loosen his grip, and she inserted two fingers underneath the

lanyard so she could breathe.  Then he unexpectedly let go.  He told her not to move, then apologized and accused her of attacking him.

Soon after, Ms. Hernandez walked toward the door to escape.  She noticed it was locked and surmised that her attacker had locked it once he came into the room.  She fumbled with the chain, unlocked the dead bolt, and then escaped.

She went downstairs and into the front desk area and locked the door with a deadbolt.  She called her manager, who was on his way into work.  She began to vomit blood into a trash can while she waited for her manager to arrive.  Once her manager arrived, he called the police.

### Argument related to recorded jail call

During a break in trial, the State notified the court it wanted to have admitted a recording of a jail call between Mr. Jackson-Smith and his mother.  During a break, the trial court listened to the recording.  It then requested argument.

The State argued the call was relevant because in it, Mr. Jackson-Smith expressed his desire to have Ms. Hernandez killed—"that's critical to showing what his intent was, that his intent is consistent, that he wanted her dead at the time this happened and he continues to want her dead."  1 RP (Dec. 15, 2021) at 457.  Defense counsel disagreed with the State's characterization of the call, explained that Mr. Jackson-Smith's recorded

comment that he wanted Ms. Hernandez killed "doesn't give us anything as to his state of mind during the event. . . . And it's clear that what he's commenting on is him being in jail believing that she was the person that had . . . attacked him." 1 RP (Dec. 15, 2021) at 458. He argued the recording should be excluded under ER 403 because "the probative worth [of the recorded comment] is clearly outweighed by the prejudicial effect." 1 RP (Dec. 15, 2021) at 458. The State replied, "[T]he bottom line is there is an Attempted Murder charge. The State has to prove that the defendant intended to kill the victim for that charge. And there is evidence on that jail phone call that he wants the victim killed, so it is critically relevant." 1 RP (Dec. 15, 2021) at 459.

The court ruled the recording admissible, and explained:

[The recording] is relevant. . . . The concern is whether it's so highly prejudicial that it outweighs the probative value of it. But given the fact that intent is an . . . element that needs to be proven and he expresses the desire to have her dead, I am going to allow the admission of it.

1 RP (Dec. 15, 2021) at 459.

When trial resumed, the State moved to admit the call recording. The court asked defense counsel if he had any additional objections. Defense counsel responded that he did not. The State then played the entire recorded jail call for the jury.

The recorded jail call

Mr. Jackson-Smith made the call 14 days after his arrest. The call lasts approximately 9 minutes. It begins with him telling his mother he pleaded not guilty. He tells her he hopes for bail because he thinks he will not handle himself well. He vents about an officer and says he may get into a fight with him because the officer lied to him and denied him rights. He tells his mother, "my life got fucked over by some fucking cunt again." Ex. 35, at 2 min., 10 sec. to 2 min., 19 sec. He and his mother then discuss the trouble they are having getting ahold of family to assist him. He then vents about the amount of bail.

At that point, midway through the call, Mr. Jackson-Smith states: "I'm just going to say it, I hope somebody kills that fucking bitch. She fucking deserves it. How many people has she fucked over like me, I don't know because they don't give a fuck." Ex. 35, at 4 min., 22 sec. to 4 min., 35 sec. He insinuates that Ms. Hernandez stole $300 from his duffle bag and asks if the detective checked it for fingerprints. He continues to vent, then he asks for the number for a bail bondsman. He then says, "I can't fucking grieve my uncle in peace without some cunt attacking me in my own hotel room." Ex. 35, at 8 min., 3 sec. to 8 min., 10 sec. The call concludes with him saying, "I love you and I am sorry you had to hear all that." Ex. 35, at 8 min., 23 sec. to 8 min., 30 sec.

The defense's case

Mr. Jackson-Smith testified. He claimed he was acting in self-defense.

He testified about his encounter with Ms. Hernandez. She explained the motel's policy about him waiting outside, and he eventually agreed. He left a phone in the room to record her. He waited outside but eventually became impatient. He walked into the room and saw Ms. Hernandez on her phone. He tried to get her attention twice with no response, and said "'[g]et the fuck off the phone and get out of my room, you stupid cunt.'" 2 RP (Dec. 16, 2021) at 565. She did not hear him. He then took off his sandal and threw it, but badly missed.

He testified he checked his phone and it was still recording, so he turned it off, but then got hit on the back of his head. He reacted by swinging his left arm backward and hitting Ms. Hernandez. She advanced and he put his hands up, apologized, and asked her to leave. He turned around and muttered, "'Fuckin' psycho cunt.'" 2 RP (Dec. 16, 2021) at 567. He then heard a "*click clack*" sound he thought was a gun, but it was Ms. Hernandez closing and locking the door. 2 RP (Dec. 16, 2021) at 567. She then lunged at him twice before he threw her onto the bed. She fell off the bed, then stood up "like a monkey out of a box." 2 RP (Dec. 16, 2021) at 568-69.

He testified she advanced again, prompting him to panic and throw an elbow. She got on top of him and she tried to jab his eyes with her fingers, and she bit him when he tried to push her off. She tried to stab him with the keys on her lanyard. He then grabbed her hair and lanyard and yanked her back, while shoving his leg into her stomach as hard as he could. He described Ms. Hernandez as looking "like a king of hearts buffoon." 2 RP (Dec. 16, 2021) at 572. He then grabbed her hair, swung her, and slammed her down. That ended the scuffle, and he asked her why she attacked him. He did not recall Ms. Hernandez saying he attacked her.

When asked if calling the police crossed his mind, he explained he "had been in some not good situations involving women, and the cops do not really help a person who looks like me when it comes to women . . . ." 2 RP (Dec. 16, 2021) at 575. He testified he thought he would be in trouble and that she would not. He realized he needed to get out of there, so he packed up his things and left.

As for the jail call to his mother, he testified he only called to "bitch" about his situation. 2 RP (Dec. 16, 2021) at 590. He characterized his comment about killing Ms. Hernandez as "some weird comedy response stuff." 2 RP (Dec. 16, 2021) at 591. When asked if he really wanted to have Ms. Hernandez killed, he explained:

9

> Not killed, maybe some really off-the-wall, stupid comedy thing like when you're crossing the street one day and then some douche bag in a Hummer listening to *It's the End of the World As We Know It* playing *Candy Crush* on his cell phone just not paying attention slams into you . . . .

2 RP (Dec. 16, 2021) at 591.  The defense rested.

### Verdict

The jury heard closing arguments, deliberated, and returned its verdicts.  It acquitted Mr. Jackson-Smith of attempted murder in the first degree, but convicted him of assault in the first degree and kidnapping in the first degree.

Mr. Jackson-Smith timely appealed.

### ANALYSIS

#### HARMLESS EVIDENTIARY ERROR

Mr. Jackson-Smith argues the trial court erred by admitting the recorded jail call because its probative value, if any, was substantially outweighed by its unfair prejudice.  We agree.

Only relevant evidence is admissible.  ER 402.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  ER 401.

At trial, the State argued that the recorded jail call was admissible because it showed that Mr. Jackson-Smith intended to kill Ms. Hernandez 14 days earlier. We disagree. There is nothing Mr. Jackson-Smith said during the call that linked his stated desire to have Ms. Hernandez killed with his attack on her 14 days earlier. Rather, as he put it, he believed he was "fucked over" again by a woman, meaning she attacked him, but he was arrested. Ex. 35, at 4 min., 22 sec. to 4 min., 30 sec.

We review a trial court's evidentiary ruling for manifest abuse of discretion. *State v. Gregory*, 158 Wn.2d 759, 835, 147 P.3d 1201 (2006). Such an abuse is shown if the evidentiary ruling is based on facts not supported by the evidence. *State v. Ramires*, 109 Wn. App. 749, 757, 37 P.3d 343 (2002); *State v. Williamson*, 100 Wn. App. 248, 257, 996 P.2d 1097 (2000). Here, the trial court manifestly abused its discretion by admitting the recording because the evidence failed to link Mr. Jackson-Smith's recorded comment with why he attacked Ms. Hernandez 14 days earlier. *See also Bell v. State*, 147 Wn.2d 166, 182, 52 P.3d 503 (2002) (Although the threshold for "relevance" is low, a trial court abuses its discretion when there is only a speculative link between the evidence and the proponent's theory.).

11

A trial court's improper admission of evidence generally is a nonconstitutional error that requires reversal only if the evidence materially impacted the trial's outcome. *State v. Beadle*, 173 Wn.2d 97, 120-21, 265 P.3d 863 (2011). Erroneous admission of evidence is harmless unless there is a reasonable probability that, but for the error, the verdict would have been materially different. *State v. Ashley*, 186 Wn.2d 32, 47, 375 P.3d 673 (2016).

Mr. Jackson-Smith argues the recording was prejudicial because "it misleadingly suggested he had a propensity to want to harm or even kill women he encounters [and p]ropensity evidence is categorically barred under ER 404(b)." Br. of Appellant at 18 (internal quotation marks omitted). He further argues the call reveals he hates women, and the jurors will likely reason that "his propensity to hate women made it more likely he attacked Hernandez instead of her attacking him." Br. of Appellant at 23-24. We decline to reverse based on these arguments.

"When the trial court overrules a specific objection and admits evidence, [a reviewing court] 'will not reverse on the basis that the evidence should have been excluded under a different rule which could have been, but was not, argued at trial.'" *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006) (internal quotation marks omitted) (quoting *State v. Ferguson*, 100 Wn.2d 131, 138, 667 P.2d 68 (1983)). At trial,

Mr. Jackson-Smith's sole basis for why the recorded call should not be admitted was

ER 403, i.e., that its relevance was substantially outweighed by its unfair prejudice.  He

did not object to the recording under ER 404(b) nor did he argue that the objectionable

statements were improper propensity evidence.  For this reason, we decline to reverse

based on this unpreserved argument.

Nor is there a reasonable probability that the outcome of the trial would have been

materially different had the trial court excluded the offensive jail call.  Mr. Jackson-

Smith's language in the recording was not much different than his language at trial.  At

trial, he repeatedly referred to Ms. Hernandez using the same vulgar term he used when

he spoke to his mother on the recorded call.  In addition, he admitted to grabbing Ms.

Hernandez by her hair, swinging her around, and throwing her on the floor.  He referred

to her as a "monkey out of a box" and as a "king of hearts buffoon."  2 RP (Dec. 16,

2021) at 569, 572.  Finally, the jury heard his odd explanation that he did not want her

killed but would not mind some "stupid comedy thing" like if a Hummer slammed into

her.  2 RP (Dec. 16, 2021) at 591.  In light of his own testimony, we conclude that the

trial court's evidentiary error was harmless.

EFFECTIVE ASSISTANCE OF COUNSEL

Mr. Jackson-Smith claims he received ineffective assistance of counsel because counsel failed to request a limiting instruction related to the jail call. We disagree.

We review a claim of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). Criminal defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018).

Washington follows the *Strickland*[1] standard for reversal of criminal convictions based on ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A defendant bears the burden of showing that (1) his counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, (2) there is a reasonable probability that but for counsel's poor performance the outcome of the proceedings would have been different. *See id*. at 32-35. If either prong is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

With regard to the first prong, a defendant must overcome a strong presumption that counsel's performance was reasonable and, when counsel's conduct can be

---

[1] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

characterized as a legitimate trial strategy, performance will not be deemed deficient. *State v. Breitung*, 173 Wn.2d 393, 398, 267 P.3d 1012 (2011). To rebut this presumption, the defendant bears the burden of establishing the absence of any conceivable legitimate tactic explaining counsel's performance. *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Mr. Jackson-Smith does not describe what limiting instruction trial counsel should have requested. Perhaps, he believes trial counsel should have asked the court to instruct the jury it should consider the recorded comment for the limited purpose of whether he intended to kill Ms. Hernandez. There was good reason not to request such an instruction.

As mentioned previously, the recorded comment had nothing to do with whether Mr. Jackson-Smith intended to kill Ms. Hernandez 14 days earlier. Had defense counsel requested the court to instruct the jury that it should consider the comment only for that purpose, the court's instruction might have *caused* the jury to believe the recorded comment should be so construed. We conclude there was a legitimate trial strategy in not requesting the court to give such an instruction. Because Mr. Jackson-Smith has failed to show his trial counsel performed deficiently, we reject his ineffective assistance of counsel claim.

15

No. 38745-3-III
*State v. Jackson-Smith*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

I CONCUR:

_____
Siddoway, J.

No. 38745-3-III

FEARING, C.J. (concurring) — The majority writes in the second paragraph: "The jury acquitted Mr. Jackson-Smith of attempted murder, the crime for which the evidence was offered." Majority at 1. Assuming the majority employs this thought to hold, in part, that the offensive statements from James Jackson-Smith captured on the recording lacked prejudice because the State only used the evidence to convict for attempted murder, I disagree.

The jury also found James Jackson-Smith guilty of first degree assault. The State also introduced, for purposes of the first degree assault charge, Jackson-Smith's expression to his mother of his hope that someone kills Starr Hernandez. A motivation to kill someone would not only bear relevance to a murder charge, but also an assault charge. I agree, however, that the recording, although irrelevant, caused no prejudice in the conviction for first degree assault because of Jackson-Smith's inopportune trial testimony of a wish for a Hummer to strike Hernandez why the oversized vehicle's audio system played *It's the End of the World As We Know It*.

I concur:

_Fearing, J._
Fearing, C.J.