## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58207-4-II |
| Respondent, | |
| v. | |
| CRAIG ALAN KENEMORE, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J — Craig Kenemore appeals his convictions for assault in the second degree and gross misdemeanor harassment. He argues that he received ineffective assistance of counsel because his attorney failed to object to inadmissible, highly prejudicial propensity evidence. He also argues the victim penalty assessment (VPA) and DNA collection fee imposed must be stricken. Because counsel's failure to object at trial did not prejudice Kenemore, we affirm; however, we remand with instructions to strike the VPA and DNA collection fee.

FACTS

I.      FACTUAL BACKGROUND[1]

On the evening of May 16, 2022, Craig Kenemore and his wife, Tamara Miller, had friends over for a get together at their house. Kenmore and Miller both drank alcohol. Their guests included friends Darryl Crago and his spouse, Jeremy Moen, known as "Mo." 1 Rep. of Proc.

---

[1] This narrative account is established predominantly from trial testimony.

(RP) at 399. Kenemore and Miller both had firearms in the house, including a shotgun that was kept behind the front door. Vera Phillips ("Ma"), who was the mother of Kenemore's childhood friend, lived with them, and they also had three Rottweiler dogs: Eleanor, Knute, and Tapfer, with Knute being more attached to Miller.

Earlier in the evening, Miller worked on putting flooring down in the shop with Moen and Miller's friend, Heather Salazar, who had been staying with them for several days. Afterwards, there was socializing. Sometime between 8:00 a.m. and 9:00 p.m., Crago and Moen left to go home. Salazar was the only remaining guest.

There were conflicting accounts as to whether Miller and Kenemore had any arguments up to that point in the evening. According to Crago, he had not seen any argument between Kenemore and Miller or Salazar. According to Moen, there was a "mild conflict" when Kenemore came out to the shop and critiqued their flooring work. 1 RP at 414. Moen also stated Kenemore gave them a "disdainful" look and had an "intense conversation" with Miller. 1 RP at 421-22.

At around 1:00 a.m. on May 17, 2022, Salazar showed up at Crago and Moen's house expressing concern for Miller's safety. Later, Salazar stated she could not recall what exactly angered Kenemore but that Miller interrupted him speaking to Salazar, and he threw his chair behind him, got in Miller's face, yelled at her, and slapped her cup out of her hand. Salazar stated she tried to intervene between Kenemore and Miller, and Kenemore's anger turned toward Salazar with him calling her names and saying he was going to "beat [her] down." 2 RP at 509. Salazar also stated Kenemore said he was going to kill Salazar and burn the house down.

After Salazar's arrival at his house, Crago immediately went back over to Kenemore's house to check on him and Miller. Crago said when he arrived, Kenemore and Miller were talking but stopped when he walked into the room. About 30 seconds later, Miller left. Crago said

2

Kenemore was more intoxicated and was upset and angry. He said Kenemore told him he found it disrespectful that Salazar parked under the covered area by the house where Miller would normally park, despite the fact that Miller suggested she park there. Kenemore was also upset that he and Miller had given sponsorship money for a fundraising event but that their businesses would not appear on the T-shirts for the event. Crago talked with Kenemore for about an hour to an hour and a half before he felt that Kenemore had calmed down, and Crago returned home.

While Crago had gone to speak with Kenemore, Salazar remained at Crago and Moen's residence. After about 45 minutes, Miller also showed up there. She had brought Knute with her. As soon as Miller showed up, Salazar left to go back to California. Moen offered to let Miller stay there for the night, but Miller declined. Moen stated that while Miller appreciated the offer, Miller "saw it as an inconvenience" and said, "No, I'll take care of this myself." 1 RP at 434.

At around 2:20 a.m., Miller left Moen's house and returned home, but she did not park under the carport. Miller put some of her things in a duffel bag, then put on her pajamas to go to bed. She stated that she put a desk chair with a case of water on it in front of the door because she "just wanted to go to bed [and] be left alone." 2 RP at 687.

Kenemore came into the room demanding the keys to her vehicle to put it under the carport. Kenemore was upset that she had barricaded the door. Miller gave him the keys.

At this point, Miller changed out of her pajamas and put on jeans and a sweatshirt. She then started an audio recording on her phone.

At the beginning of the recording, metallic clattering sounds can be heard, after which Miller states to the recording, "This is me loading my gun because my husband threatened my life." Ex. 100 (audio recording), at 1 min., 13 sec. to 1 min., 18 sec. Then, the recording documents the sound of the gun being loaded. Miller states, "I'm putting my .45 in my holster because my

husband threatened my life." Ex. 100 (audio recording), at 1 min., 27 sec. to 1 min., 32 sec. Miller testified she placed the gun into the kangaroo pocket of her sweatshirt.[2]

The recording then documents Kenemore accusing Salazar of being a homewrecker, threatening to kill Salazar, and threatening to burn the house down. Kenemore stated he would "cut [Salazar's] fucking throat with [a razor blade]" and that he would kill Salazar in front of Miller and make her watch and participate. Ex. 100 (audio recording), at 14 min., 4 sec. to 14 min., 6 sec. Kenemore also expressed offense that Miller had barricaded her door. Kenemore stated he had never touched Miller and asked her if he had, to which Miller responded, "No, but you've gotten close." Ex. 100 (audio recording), at 21 min., 27 sec. to 21 min., 29 sec. Kenemore said, "Do you ever think I'd lay a hand on you ever, ever, ever honestly?" Ex. 100 (audio recording), at 24 min., 48 sec. to 24 min., 52 sec. Miller responded "No, but you'd destroy the world." Ex. 100 (audio recording), at 24 min., 53 sec. to 24 min., 54 sec.

About halfway through the audio recording, Kenemore asked Miller to go outside and not smoke in the house. Miller agreed, and they went outside. Kenemore went on to say, "I don't think it's fair I'm being treated like a monster? . . . Tammy would I ever hit you? Would I ever hurt you? Would I ever touch you?" Ex. 100 (audio recording), at 26 min., 27 sec. to 26 min., 43 sec. Miller responded, "No, but you'll threaten to burn the house down. You'll threaten to shoot my dog." Ex. 100 (audio recording), at 26 min., 44 sec. to 26 min., 47 sec. Kenemore stated, "I will burn the house down . . . and I will shoot Knute." Ex. 100 (audio recording), at 26 min., 52 sec. to 26 min., 56 sec. Kenemore also stated he almost shot Miller when they lived in California.

---

[2] There is inconsistency in the record as to whether Miller placed the gun in the holster and then into her pocket. On the recording, Miller states she places the gun in the holster. However, at trial, Miller testified that she did not believe it was in the holster.

Near the end of the recording, Kenemore stated he was going to shoot himself. Miller said, "Get out of my face," and Kenemore responded, "What are you gonna do, shoot me?" Ex. 100 (audio recording), at 47 min., 21 sec. to 47 min., 24 sec. Kenemore stated he was going to shoot Knute just to make Miller "even more sad." Ex. 100 (audio recording), at 48 min., 3 sec. to 48 min., 4 sec. He told Miller to leave, saying, "The keys are in [the car]. Get it and go. Bye. . . . Get Ma and go." Ex. 100 (audio recording), at 48 min., 17sec. to 48 min., 20 sec.; 48 min., 47 sec. to 48 min., 48 sec.

Kenemore stated, "Get your baby boy. Or no, leave him here. . . . Go. Go now. Beat it. Get in your truck and go. Go. Get out of here. . . . Run. Run like the wind. Take Ma if you want to or leave her here." Ex. 100 (audio recording), at 49 min., 28 sec. to 49 min., 46 sec. Then, Kenemore can be heard calling Knute, "Hey, Knute, what's up bud?" Ex. 100 (audio recording), at 49 min., 53 sec. to 49 min., 55 sec. Kenemore said, "Do you think I'm kidding? Do you wanna watch? Turn your head. Turn your fucking head. . . . Turn your fucking head." Ex. 100 (audio recording), at 50 min., 1 sec. to 50 min., 10 sec.

Then, the recording picks up a single loud pop. The recording documents a thudding sound. Miller can be heard quietly saying, "Don't . . . fuck with me." Ex. 100 (audio recording), at 50 min., 19 sec. to 50 min., 22 sec. Then, Kenemore said, "I never—." Ex. 100 (audio recording), at 50 min., 22 sec. to 50 min., 24 sec.

Miller then stated louder, "What in the fuck? You throw a fucking shotgun in my face and you spun around? What in the hell?" Ex. 100 (audio recording), at 50 min., 25 sec. to 50 min., 33 sec.

Miller's recording went silent after 51 minutes 2 seconds. She had dialed 911 and was on that call during this time. Miller told the 911 operator that she shot her husband in self-defense.

5

On the 911 recording, Kenemore asked Miller why she shot him, and she replied, "Why did I shoot you? Because you fucking pulled the shotgun on me." Ex. 98 (911 audio recording), at 5 min., 42 sec. to 5 min., 46 sec.; *see also* Ex. 98 (911 audio recording), at 7 min., 29 sec. to 7 min., 30 sec.; 10 min., 13 sec. to 10 min., 15 sec. (documenting Miller repeating that Kenemore pulled the shotgun on her.) Kenemore said something in response, but it is unclear. Then, they began talking about where the dogs were.

First responders stated that Kenemore had been shot in the face, and the handgun Miller used was on the kitchen island. There was also a shotgun on the living room floor. Kenemore was airlifted to a hospital where he remained for several months.

Kenemore was ultimately charged with assault in the second degree and harassment—threat to kill.

II. TRIAL

At trial, Kenemore did not testify. His theory of the case was that he did not point a shotgun at Miller, but rather, Miller shot him because he was going to shoot her dog, Knute. Miller testified that after they went outside to smoke, she went back in to grab her bag and her dog to leave. Kenemore followed her inside and picked up the shotgun from behind the door at some point. She said he walked in front of her with the shotgun and touched her in the chest with the gun barrel. She testified Kenemore was calling Knute and tracking his movements with the shotgun as Knute ran around the kitchen island. She stated Kenemore "kind of trip[ped] up a little bit as Knute r[an] past" and then he stopped tracking the dog. 2 RP at 704. Then, she said Knute ran back to the bedroom. The State asked Miller what was happening in the recording when Kenemore said, "Turn your head. Turn your head," 2 RP at 705, and she responded:

> I—I was looking down the hallway, and I was afraid to turn my head. And then I turned my head and I saw the shotgun come up on me.

. . . .

And when I finally—I was afraid to look, because I thought he was going to shoot me. As he's saying, "Look at me. Look at me. Look at me." And I made sure that Knute was safe and I looked.

And he was doing—doing this with the shotgun. He was—he was—had the shotgun like this and was turning his whole body, and it was—it was coming on me, the barrel of the shotgun.

. . . .

[State]: And what did you decide to do when you saw that?
[Miller]: I pulled my gun out of my pocket and I shot him.

2 RP at 705-06.

On cross-examination, when asked about the moment she shot Kenemore, the following exchange took place.

[Defense Counsel]: . . . [D]o you know if [Kenemore's] focus was on Knute at that moment?
[Miller]: Knute was in my bedroom at that time, so I would say, no.

2 RP at 764. However, later on cross-examination, the following exchange took place.

[Defense Counsel]: So at 50:07 [in the recording], he's asking if you want to watch him shoot Knute. And three seconds later, you shoot him in the face; is that right?
[Miller]: Apparently.
[Defense Counsel]: So your dog wasn't out of the kitchen?
[Miller]: I don't know. I guess not. In my—in my memory, he was already gone.

2 RP at 772.

The State also asked Crago if he recalled a time when Kenemore approached him in an aggressive way, and Crago responded:

It was shortly after we had met. I think it was actually the second time I had showed up at his house. I showed up in my Honda, which he didn't recognize, and he came out the front door with a shotgun.

1 RP at 396.

The State asked Salazar if there were any big confrontations that occurred in the days leading up to the shooting, and she responded:

7

Well, there was a couple days before that had happened, a kid came up on the property with an all-tinted mask from a helmet, and Craig pulled out the shotgun on him saying how he doesn't go on his property without showing his face. And it happened to be one of their mutual friend's sons.

[State]: Okay. So he actually ended up knowing the person, but he didn't recognize him based on some helmet he was wearing?

[Salazar]: Right.

[State]: Okay. But he was quick to bring the shotgun out?

[Salazar]: Yes.

[State]: Had you ever seen that—something like that, another time like that?

[Salazar]: He had gone outside with the shotgun quite a few times, stomping and thinking he saw something, but—

. . . .

but there was nobody out there at that time.

1 RP at 477-78. Kenemore's counsel objected to Salazar's testimony on relevance grounds, but the court overruled the objection.

The jury ultimately found Kenemore guilty of assault in the second degree and gross misdemeanor harassment, but not guilty of harassment—threat to kill. The jury also found that Kenemore was armed with a firearm when he committed both offenses and that Kenemore and Miller were intimate partners.

The court imposed a high-end standard range sentence of 12 months for the assault in the second degree conviction with a 36-month firearm enhancement. This sentence was to run concurrently with the 12-month sentence for the gross misdemeanor harassment conviction. The court also found Kenemore indigent, but imposed a $500 victim assessment and a $100 DNA collection fee.

Kenemore appeals.

ANALYSIS

I.      INEFFECTIVE ASSISTANCE OF COUNSEL

Kenemore argues that he received ineffective assistance of counsel because his attorney failed to object to prejudicial propensity evidence relating to two prior instances of conduct

8

regarding display of his shotgun. We conclude that even if counsel's performance was deficient, prejudice does not flow from the identified deficient performance.

A.    Standard of review

We review ineffective assistance of counsel claims de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Further, "we do *not* view the evidence in the light most favorable to the State; instead, we 'must consider the totality of the evidence before the judge or jury.'" *State v. Bertrand*, 3 Wn.3d 116, 139, 546 P.3d 1020 (2024) (quoting *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

B.    Legal principles

To prove ineffective assistance of counsel, a defendant must show (1) counsel's representation was so deficient it fell "below an objective standard of reasonableness" and (2) that deficiency prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting and applying test from *Strickland*, 466 U.S. at 687-88). Failure to satisfy either requirement "'defeats' the claim." *Bertrand*, 3 Wn.3d at 128 (quoting *Strickland*, 466 U.S. at 700).

First, "[t]he defendant must overcome 'a strong presumption that counsel's performance was reasonable.'" *Id.* at 130 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *Kyllo*, 166 Wn.2d at 863. A "defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Further, when an ineffective assistance of counsel claim is based on a failure to object, the defendant must show that the objection "would likely have been successful." *State v. Gerdts*, 136 Wn. App. 720, 727, 150 P.3d 627 (2007). "However, if defense counsel fails to object

to *inadmissible* evidence, then they have performed deficiently." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021).

Second, prejudice requires showing that had counsel's performance not been deficient, "there is a reasonable probability . . . the result of the proceeding would have differed." *Estes*, 193 Wn. App. at 488. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012). Therefore, "prejudice exists when there is 'a probability sufficient to undermine [the court's] confidence in the outcome.'" *Bertrand*, 3 Wn.3d at 129 (alterations in original) (quoting *Strickland*, 466 U.S. at 694).

      1.     ER 404(b)

The purpose of ER 404(b) is to "'prohibit the State from attempting to use evidence of bad acts in order to prove the propensity of the defendant to commit the same type of bad act.'" *Vazquez*, 198 Wn.2d at 256 (quoting *State v. Trickler*, 106 Wn. App. 727, 734, 25 P.3d 445 (2001)). "Under ER 404(b), '[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.'" *Vazquez*, 198 Wn.2d at 256 (alternation in original). However, such evidence may be used to show things such as "intent, knowledge, or absence of mistake." *Trickler*, 106 Wn. App. at 732.

Kenemore argues his counsel should have objected to Crago's and Salazar's testimony that he pulled a shotgun on people on two prior occasions and that counsel was deficient for failing to do so. Kenemore argues this testimony was inadmissible propensity evidence under ER 404(b).

Crago testified that "[he] showed up in [his] Honda, which [Kenemore] didn't recognize, and [Kenemore] came out the front door with a shotgun." 1 RP at 396. Salazar testified that "a kid came up on the property with an all-tinted mask from a helmet, and [Kenemore] pulled out the

shotgun on him saying how he doesn't go on his property without showing his face." 1 RP at 477-78. The State responded by asking, "But he was quick to bring the shotgun out?" 1 RP at 478. To which Salazar replied, "Yes," and further elaborated how Kenemore "had gone outside with the shotgun quite a few times." 1 RP at 478.

Even if Kenemore can show that counsel's performance was deficient for failing to object to this testimony, he cannot show that this deficiency prejudiced him. If the improper propensity evidence had been excluded, the remaining evidence was nevertheless compelling. The phone recording corroborated Miller's account of events because her testimony tied in precisely with the recording as she described what Kenemore meant when commanding that she turn her head. The timing of his words related to the soon-following report of the discharge of Miller's pistol align with her testimony that he was commanding that she look at him while he held the shotgun to her chest. Further, the jury also heard on the recording Kenemore's own testimony that he had almost shot Miller previously. Therefore, in light of the totality of the evidence, there is no reasonable probability that the result of the proceeding would have differed. Since credibility determinations are the province of the jury, our confidence in the outcome is not undermined, and we conclude that Kenemore was not prejudiced by any deficient performance.

II.     VPA AND DNA COLLECTION FEE

Kenemore also argues the VPA and DNA collection fee should be stricken. The State concedes. We agree with Kenemore and accept the State's concession.

Effective July 1, 2023, RCW 7.68.035(4) prohibits courts from imposing the crime victim penalty assessment on indigent defendants. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048, *pet. for rev. filed*, 102378-2 (2023). The legislature also amended RCW 43.43.7541 to

11

require waiver of a DNA collection fee imposed before July 1, 2023 upon the defendant's motion. RCW 43.43.7541(2).

Here, Kenemore was found indigent and requested the DNA collection fee imposed be struck. In light of these statutory changes, we remand with instructions to strike the VPA and the DNA collection fee.

## CONCLUSION

We affirm Kenemore's convictions. However, we remand for the trial court to strike the VPA and DNA collection fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Che, J.